FRANK B. HALL & CO., Appellant,

v.

BEACH, INC., Appellee.

No. 13–86–273–CV.

Court of Appeals of Texas, Corpus Christi.

April 23, 1987.

Rehearing Denied April 23 and May 20, 1987.

**254**

Don Weitinger, Weitinger, Steelhammer & Tucker, K.L. Carnley, Irving C. Stern & Associates, Houston, for appellant.

John T. McDowell, Bankston, McDowell & Olivier, Jeffrey W. Steidley, Olivier & Steidley, Houston, Franklin H. Perry, Delta Sue Best, Thompson, Coe, Cousins & Irons, Larry Gollaher, Dallas, for appellee.

Before UTTER, SEERDEN and DORSEY, JJ.

### OPINION ON MOTION FOR REHEARING

UTTER, Justice.

This Court's original opinion of March 18, 1987, is withdrawn, and the following opinion is substituted therefor.

Appellee, Beach, Inc., brought suit against its insurance broker, Frank B. Hall & Co., and the carrier, Employers Insurance of Wausau, for failure to pay a claim under an insurance policy, violations of the Deceptive Trade Practices Act (DTPA) and negligence. The jury found in favor of Beach and awarded actual damages of $2,130,000.00. The trial court rendered judgment for $6,390,000.00. We affirm in part and reverse and render in part.

Beach is a trucking company, primarily engaged in the business of hauling and rigging oilfield equipment. In September of 1982, Beach contacted Hall to obtain a quotation for cargo and liability insurance for its oilfield operations. Beach obtained insurance coverage, through Hall, from Wausau. In August of 1983, Beach was hired by Eljay Drilling Corp. to move and rig-up a draw works.[1]

It was late in the afternoon when Beach arrived at the drilling site with Eljay's draw works on its trailer. It was decided that the draw works would be left on the trailer until the next day. The next morning, as Beach's crane was removing the draw works from the trailer and turning it in order to place it upon the "substructure," the spreader beam broke and the draw works fell, striking the corner of the substructure. The draw works suffered extensive damage.

Wausau denied the claim based on its interpretation of the policy issued to Beach that there was no coverage for "lifting and rigging" and that the draw works was not "in transit" within the meaning of the policy.

Beach filed suit against Hall and Wausau. Eljay intervened and filed claims against Beach and Wausau. Hall and Wausau cross-claimed against each other and counterclaimed as to Beach. The judgment was for Eljay against Beach and for Beach against Hall. Wausau was granted a take-nothing judgment against the claims of Eljay and Beach.

■ By its first point of error, Hall contends that the trial court erred in holding that the insurance policy did not cover the

---

1. The "draw works" is the "collective name for the hoisting drum, shaft, clutches and other operating machinery used in the drilling of a well.... Draw works serve as a power-control center for the hoisting gear and usually for the rotary elements of the drill column." H. Williams & C. Meyers, Oil and Gas Law, Manual of Oil and Gas Terms, p. 240 (1984). The draw works is the biggest and most expensive piece of equipment on a drilling rig. It is approximately 25 feet long and weighs between 40 and 45 tons.

loss because the draw works was in transit at the time of the accident.

All parties agreed that whether there was coverage under the policy was a question of law for the court to decide. The trial court's ruling on that question necessarily depended upon the language of the policy and the facts of the case.

The cargo policy issued to Beach covered property "in transit at and between points and places ... from the time such property leaves the factory, store, or warehouse at initial point of shipment until such property is delivered at its destination...."

Hall contends that Beach was merely "unloading" the draw works when the accident occurred and that the draw works was still "in transit" while it was being unloaded. Wausau claims that Beach was not "unloading" but was engaged in an operation known as "rigging up."[2]

The phrase "in transit" has consistently been construed by our courts to mean "in the course of passing from point to point." *United States Fidelity and Guaranty Co. v. Hutson Construction Co., Inc.*, 544 S.W.2d 762 (Tex.Civ.App.—Dallas 1976, writ ref'd n.r.e.); *Haggar Co. v. United States Fire Insurance Co.*, 497 S.W.2d 61 (Tex.Civ.App.—Texarkana 1973, no writ); *Simons v. Niagara Fire Insurance Co.*, 398 S.W.2d 833 (Tex.Civ.App.—Fort Worth 1966, no writ). *See generally Chief Freight Lines Co. v. Holiday Inns of America, Inc.*, 469 S.W.2d 413, 417 (Tex. Civ.App.—Dallas 1971, no writ) ("[N]ormally unloading is not part of the delivery but is performed by the consignee."). Such an interpretation of the word "transit" is consistent with the language of the policy in the case at bar, "until such property is delivered at its destination."

It is undisputed that the draw works arrived at the rig site the day before the accident. The workmen left the draw works on the truck and returned the following day to lift the draw works to the rig floor.

Hall further argues that the draw works was still "in transit" and had not yet been "delivered at its destination" because it had not been removed from the truck. Hall cites *T.I.M.E.–D.C., Inc. v. Southwestern Historical Wax Museum, Corp.*, 528 S.W.2d 901 (Tex.Civ.App.—Waco 1975, no writ), for the proposition that a shipment is "in transit" while the carrier's driver is unloading it. In *T.I.M.E.*, a common carrier was to deliver a wax figure to a museum. When the truck driver arrived at the museum, he could not get the crate out of the truck because it was wedged between other crates too tightly. The driver pried the crate with a two-by-four rather roughly, but was unsuccessful. He was stopped by the museum's vice-president, who feared damage to the wax figure. The driver went back to his warehouse and then returned with the crate loosened and removed it from the truck. The evidence supported the finding that the damage was caused by the driver when he attempted to pry the crate loose.

The court stated, "We agree with the [carrier] that the ... shipment in question was 'in transit' within the meaning of the Interstate Commerce Act until the wax figure was delivered to the [museum's] possession, which was after the damage was done." *Id.* at 903–4.

We disagree with Hall's interpretation of *T.I.M.E.* The wax figure was still "in transit" because the driver had *unsuccessfully* attempted to deliver it. The damage was inflicted upon the wax figure when the driver tried to pry it loose. He took it back to his warehouse and then successfully delivered it on his second trip to the museum. Therefore, the wax figure was "in transit" when damaged.

When Beach delivered the draw works to the rig site, its duties as a common carrier were completed. The draw works was no longer "in transit" within the meaning of the policy.

The policy does not mention coverage for loading or unloading. To read such a pro-

2. Rigging up is the actual assembly of the drilling rig and involves hoisting and lifting of heavy machinery onto the drilling platform.

vision into it would be to rewrite the contract.

■ In addition, even if the draw works is not "delivered at its destination" until "unloaded" from the truck, Beach was not engaged in an "unloading" activity. The evidence is sufficient to support a finding that Beach was engaged in "rigging up" when the accident occurred.

Hall additionally argues that drawing a distinction between "unloading" and "rigging up" requires a "strained and immaterial distortion of the facts." Essentially, Hall contends that "unloading" cannot be separated from "rigging" because in order to "rig up" the draw works had to be "unloaded" from the truck. Although this is true to some extent, we are dealing here with technical terms. The evidence established that "unloading" does not always involve "rigging up" and "rigging up" does not always involve "unloading." There clearly is a distinction between the two activities.

Accordingly, the trial court did not err in holding that the draw works was not in transit. Hall's first point of error is overruled.

By its second point of error, Hall contends that the trial court erred in its allocation of peremptory challenges and that a materially unfair trial resulted.

The trial court gave Beach nine strikes and Eljay, Hall, and Wausau three each. Hall argues that no antagonism existed between Beach and Eljay, and therefore, they should have been aligned on the same side.

■ The existence of antagonism between litigants is a question of law. *Garcia v. Central Power & Light Co.*, 704 S.W.2d 734 (Tex.1986); *Diamond Shamrock Corp. v. Wendt*, 718 S.W.2d 766 (Tex. App.—Corpus Christi 1986, writ ref'd n.r. e.). In making this determination, the trial court must consider the pleadings, information disclosed by pretrial discovery, information presented and representations made during voir dire of the jury panel, and any other information brought to the attention of the trial court before the exercise of the strikes by the parties. *Garcia v. Central Power & Light Co.*, 704 S.W.2d at 737. The existence of antagonism must be finally determined after voir dire and prior to the exercise of the strikes. *Id.*

Due to the nature of this case, it is important to determine which "side" of the law suit Eljay is "aligned" on. Eljay is an intervenor in this suit. It sued both Beach and Wausau. However, Eljay was not sued by any of the other parties.

The pleadings reveal antagonism between Eljay and Beach regarding Eljay's claims against Beach. However, Eljay's claims against Wausau reveal that Beach and Eljay have common interests as to Wausau. Eljay made no claim against Hall, therefore, viewing only the pleadings, Eljay could not be considered antagonistic to Hall.

As *Garcia* points out, the pleadings are not the only factor to be considered, and although viewed in isolation the pleadings may support a finding of antagonism, the trial court must consider the entire record generated prior to the exercise of the strikes. *Id.*

Hall contends that the pretrial hearing and voir dire reveal that there was no antagonism between Beach and Eljay.

At the pretrial hearing, Eljay's attorney, Mr. Perry, testified that he "definitely wanted [Beach] to win against Hall" because Eljay would be able to recover more money if recovery was against Hall. Mr. Perry also stated that it was represented to him that Beach had a "negative net worth." He agreed that if neither Hall nor Wausau pays a judgment, Eljay would not be able to collect anything from Beach. He further stated that "I am adverse to Beach on all matters that I have alleged. As a practical matter, it would benefit me if Beach had some assets." Mr. Perry also stated that he was going to "try" to strike with Beach because doing so would be "in the best interest of [his] client." However, Mr. Perry said that he may "have to exercise independent judgment on that." There is nothing in the record to indicate that

Beach and Eljay *in fact did* exercise their strikes together.

Summarizing the testimony from the pretrial hearing, Mr. Perry felt that Beach had no assets with which a judgment could be satisfied. Although realizing this, Mr. Perry intimated that he intended to pursue a judgment against Beach.

Mr. McDowell, Beach's attorney, was asked by Hall's attorney if he was "resisting" Eljay's suit. Mr. McDowell stated "I don't know. It depends on how much money we get."

■ Viewing the alignment of the parties from the time immediately prior to the exercise of the strikes, it becomes apparent that if the trial court determined that there was no coverage under the policy, then Eljay would not prevail on its claim against Wausau. In that event, it would be imperative that Eljay obtain a judgment against Beach in order to recover damages. Therefore, the trial court did not err in aligning the parties.

■ The trial court has discretionary power in determining the number of strikes to award each litigant. *Patterson Dental Co. v. Dunn*, 592 S.W.2d 914 (Tex.1979). However, "in most cases a two-to-one ratio between sides would approach the maximum disparity allowable." *Id.* at 920.

■ In this case, we view the trial court's allocation of strikes as giving Beach six strikes and Hall and Wausau three each for the claims between them. Beach was given an additional three strikes to compensate for Eljay's action against it. Likewise, Eljay was given three strikes. Since the issue between Eljay and Wausau was purely a question of law, i.e. whether there was coverage under the policy, Wausau was not entitled to·any additional strikes.

Furthermore, there was no antagonism between Hall and Wausau on a question of fact to be submitted to the jury. *See id.* at 918. The only issue between them was also whether, as a matter of law, there was coverage under the policy. In addition, Hall's attorney stated that he was going to strike with Wausau. We find no abuse of discretion in the trial court's allocation of jury strikes. Hall's second point of error is overruled.

Hall's points of error three through six and ten through twenty-one challenge the sufficiency of the evidence to support the jury's answers to various special issues. In considering a "no evidence" or "insufficient evidence" point of error, we will follow the well-established test set forth in *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456 (Tex.1985); *Glover v. Texas General Indemnity Co.*, 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *Allied Finance Co. v. Garza*, 626 S.W.2d 120 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.); Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 Texas L.Rev. 361 (1960).

By its third and fourth points of error, Hall challenges the legal and factual sufficiency of the evidence to support the jury's answers to the three subparts of special issue no. 13. Special issue no. 13 was a damages issue which asked the jury to determine what sum of money would compensate Beach for the damages, if any, caused by Hall.

Subparts "a" and "b" of special issue no. 13, respectively, asked the jury to determine (a) Beach's lost profits in the past and (b) in the future. Subpart "c" requested that the jury determine Beach's damages for "[f]inancial loss due to the suit by Eljay Drilling."

■ Initially, Hall argues that Beach cannot recover damages for lost profits because the evidence shows that, for the years 1982 through 1985, Beach had a negative net income at each year's end. Thus, Hall contends that a "business which operates at a loss ... cannot recover lost profits."

In this case, Beach did not contend that Hall's conduct caused it to suffer another year of operating at a loss. Rather, Beach sought to prove that Hall's conduct caused it to lose *specific* business from which it would have realized a certain profit. We find this to be a valid distinction. It is

entirely possible that a business can make a profit on individual jobs, yet still end up with a net year-end loss. *See Memorial City General Hospital Corp. v. Cintas Corp.,* 679 S.W.2d 133 (Tex.App.—Houston [14th Dist.] 1984, no writ). Furthermore, simply because a business may have a net loss does not mean that it cannot suffer *further* damage at the hands of another. *See State National Bank v. Farah Manufacturing Co.,* 678 S.W.2d 661, 693 (Tex. App.—El Paso 1984, writ dism'd by agr.).

In order to recover lost profits, sufficient evidence must be produced to enable the jury to determine the net amount of lost profits with reasonable certainty. It is not necessary that the lost profits be subject to exact calculation. *White v. Southwestern Bell Tel. Co. Inc.,* 651 S.W.2d 260 (Tex.1983); *Southwest Battery v. Owen,* 131 Tex. 423, 115 S.W.2d 1097 (1938). However, opinions or estimates of lost profits must be based upon objective facts, figures or data from which the amount of lost profits can be ascertained with a reasonable degree of certainty and exactness. *Hycel, Inc. v. Wittstruck,* 690 S.W.2d 914 (Tex.App.—Waco 1985, writ dism'd); *Verette v. Travelers Indemnity Co.,* 645 S.W.2d 562, 569–70 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.).

Charles Lathrop, formerly president of Eljay, testified that Eljay began using Beach as its oilfield hauler and rigger in the early part of 1983. Beach did 100% of Eljay's rig moves in Texas. Mr. Lathrop stated that after the accident, Eljay ceased doing business with Beach. He also stated that, had the claim been paid, Beach would, in all likelihood, have continued to receive 100% of Eljay's business.

A certified public accountant testified that she examined all of Eljay's invoices generated after the accident until Eljay went out of business (a period of approximately 18 months) to determine the total amount of business which Eljay could have given to Beach but gave to competitors. The total was $377,414.00.

Jerry Horowitz, Beach's president, testified that on a rig-moving job, Beach's costs are 30%, leaving 70% as profit on each job.

Seventy percent of $377,414.00 is $264,189.80. This evidence is sufficient to uphold the jury's finding of $240,000.00 as lost profits in the past.

We now turn to Beach's future lost profits. The jury found $1,400,000.00 as future lost profits.

Mr. Lathrop is currently president of "Triple M," a company engaged in the same type of business that Eljay conducted. On direct-examination by Beach, he testified:

Q How much revenue did Beach lose as a result of this from your current company?

A We operate, the new company, Triple M, has four rigs and we operate in the Texas/Louisiana/Mississippi Gulf Coast area. I would estimate that each rig that we spent on each rig about 200,000 Dollars a year in moving and rigging. That would be 800,000 Dollars a year.

Realistically, depending where the rigs are, where we are moving them to, but in the area that Beach operates, I would think probably half of that.

Q 400,000 Dollars with Trimple M?

A Yes, sir.

There was no other testimony as to Beach's loss of profits in the future.

During closing arguments, Beach's counsel discussed future lost profits. He stated that future profits are difficult to determine, but "five years will probably cover us through the appeals...." Hall's counsel objected; the objection was sustained; and the jury was instructed not to consider the remark. A motion for mistrial was denied.

As Hall points out, the jury apparently arrived at its award of $1,400,000.00 by multiplying $400,000.00 by five (years) and then multiplying that figure by .70 (70% profit).

Mr. Lathrop's estimate of $400,000.00 is not based upon any objective facts, figures or data. It is based upon his estimate that Triple M spends *about* $200,000.00 per rig, per year, on moving and rigging. The

record is void of any objective facts, figures, or data in support of the $200,000.00 estimate. There is no evidence in the record to indicate how he arrived at these figures. Mr. Lathrop's testimony did not supply the jury with any competent evidence upon which lost profits in the future could be determined with a reasonable degree of certainty and exactness.

The testimony of Mr. Lathrop is similar to the testimony in *Fenwal, Inc. v. Mencio Security, Inc.*, 686 S.W.2d 660, 665 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.), where the testimony was that plaintiff's company would do "in the neighborhood of $300,000.00 in gross sales the next year"; would realize a profit "in the neighborhood of about I guess $60,000.00"; and "would be looking at a profit of about $72,000.00" for the year after that. The San Antonio Court of Appeals held that such testimony was "insufficient and of no probative force" and could not support the jury's findings as to lost profits. *Id.* The Court was clearly sustaining a no evidence point of error. We agree that this type of testimony is legally insufficient.

We will sustain a no evidence point of error where "the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence." Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 Texas L.Rev. 361, 363 (1960). This quantum of evidence is commonly referred to as a "mere scintilla." *Id.* Evidence of this sort has no probative force, and is the equivalent of no evidence. *Id.*

We cannot uphold an award of damages based upon speculation. *Automark of Texas v. Discount Trophies*, 681 S.W.2d 828 (Tex.App.—Dallas 1984, no writ); *Village Square, LTD v. Barton*, 660 S.W.2d 556 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.); *Van Sickle v. Clark*, 510 S.W.2d 664 (Tex.Civ.App.—Fort Worth 1974, no writ). This portion of Hall's third point of error, contending that there is no

evidence to support future lost profits, is sustained.

■ Hall also attacks subpart "c" of special issue no. 13 under which the jury awarded $490,000.00 for Beach's "[f]inancial loss due to the suit by Eljay Drilling." However, Hall has not briefed this contention and has therefore waived the point.[3] *See Keller v. Davis*, 694 S.W.2d 355 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.); *Rowden v. Texas Catastrophe Property Insurance Association*, 677 S.W.2d 83 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.); *Canales v. Borg-Warner Acceptance Corp.*, 663 S.W.2d 677 (Tex. App.—Corpus Christi 1983, no writ). The remaining portion of Hall's third point of error is overruled. In light of our disposition of Hall's third point of error, we do not reach Hall's fourth point of error which alleges that the evidence was insufficient to support the jury's findings.

By its fifth and sixth points of error, Hall contends that the evidence is legally and factually insufficient to support the jury's answers to subparts (2) and (3) of special issue no. 18. By point of error 9, Hall attacks the wording of special issue no. 18.

■ Special issue no. 18 asked the jury whether Eljay suffered any "additional damages" resulting from the accident. The jury was instructed to consider:

(1) Transportation, cranes, welding, and various service time involved in installing and modifying Rig No. 1 draw works on Rig No. 2 and rental draw works on Rig No. 1.

(2) Lost Revenue on both Rig No. 1 and Rig No. 2.

(3) Damage directly resulting from loss of profits caused by the failure of Beach to have insurance to cover the loss.

The jury found damages of (1) $61,000.00, (2) $40,000.00, and (3) $19,000.00 respectively.

---

3. Hall has argued points of error 3 through 9 together. Although we have carefully reviewed the argument presented, we have been unable to find argument or authorities which go to the jury's award of $490,000.00 for "financial loss due to the suit by Eljay Drilling."

Hall does not complain of the jury's award of damages under subpart (1). Mr. Lathrop testified that Eljay lost revenue of $46,284.00 on Rig No. 1 alone. This was based upon nine and one-half days of downtime at $4,872.00 per day. The evidence is sufficient to support the answer to subpart (2).

■ As to subpart (3), the only evidence pertaining to lost profits was also given by Mr. Lathrop. He testified that Eljay lost business from Chevron because of the incident. He testified that "the business in total that we lost due to this was 50,000 dollars." This conclusion is not based upon any objective facts, figures or data at all. The jury cannot determine an amount for lost profits with reasonable certainty based upon such information. We agree with Hall that there is no evidence to support the jury's answer to subpart (3). *See Fenwal, Inc. v. Mencio Security, Inc.*, 686 S.W.2d at 665. Hall's fifth point is sustained as it relates to the jury's answer to subpart (3). Hall's sixth point is overruled as it pertains to subpart (2); we do not reach the merits of the remainder of Hall's sixth point relating to subpart (3), which alleges that the evidence was insufficient to support the jury's finding.

Hall also contends, by points of error 9 and 8B, that the trial court erred in submitting special issue no. 18(2) because it inquires of "lost revenues." Hall argues that "lost revenues" is not the correct measure of damages. Hall's objection to the trial court's submission of this issue was "here we are talking about Special Issue No. [18] and we have got loss of revenue on both rigs, No. 1 and No. 2. Whereas, I don't believe the loss of revenue on the second rig is a recoverable item of damage under the law, as against Beach." Hall argues on appeal that the correct measure of damages is "loss of net profits." We do not reach the merits of this contention because Hall failed to make an objection specifically pointing out the matter complained of and the grounds for the objection. *Monsanto Co. v. Milam*, 494 S.W.2d 534 (Tex. 1973). The objection must "make it apparent that the trial court, though fully cogni-

zant of the ground of complaint, nevertheless chose to submit the issue." *Texas Power & Light Co. v. Barnhill*, 639 S.W.2d 331 (Tex.App.—Texarkana 1982, writ ref'd n.r.e.). Hall's points of 9 and 8B are overruled.

■ By its seventh and eighth (8A) points of error, Hall contends that the testimony of Horowitz and Lathrop regarding lost profits should not have been admitted because they were "speculative and not based on any factual evidence."

Both Horowitz and Lathrop had extensive experience in running their respective businesses. Each was qualified to testify from his own knowledge regarding the financial aspect of his business, including lost profits. *See Keller v. Davis*, 694 S.W.2d at 357. We have already dealt with the sufficiency of the evidence obtained from their testimony. Hall's seventh and eighth (8A) points are overruled.

■ By its tenth and eleventh points of error, Hall challenges the legal and factual sufficiency of the evidence to support the jury's answers to special issues 1, 3, and 5. Special issue no. 1 asked the jury whether Hall made any misrepresentations concerning the terms, benefits or advantages of the insurance policies issued to Beach. This was an Insurance Code issue. Special issue no. 3 asked the jury whether Hall made any untrue, deceptive, or misleading assertions, representations or statements concerning the business of insurance. This was also an Insurance Code issue. Special issue no. 5 asked the jury whether Hall represented to Beach that its insurance services had characteristics, uses, or benefits which it did not have. This was a DTPA issue. The jury answered all three issues affirmatively.

The evidence is sufficient to support the jury's findings on all three issues. In capsulated form, the evidence established the following. Hall had been obtaining its insurance through the Hudson Agency. This insurance included lifting and rigging coverage and was to expire in September of 1982. Beach contacted Hall seeking a better price than Hudson offered.

Robert Cox, an account advisor and vice-president with Hall, handled the Beach account. Beach employees testified that they asked Cox to "match" the insurance provided by Hudson, at a lower price.

The insurance proposal presented by Hall to Beach represented that Hall is "a full service office and is staffed to handle a full range of ... insurance needs." It also stated that Hall provides to its "clients professional insurance consulting and services to meet every conceivable demand for their insurance and risk management needs." The proposal listed many oilfield and trucking companies as Hall's clients, representing that Hall has specific expertise in those areas.

Mr. Cox admitted that, at the time he prepared the insurance proposal for Beach, he did not know what a lifting and rigging policy was. The evidence stated above is sufficient to support the jury's answers. Hall's tenth and eleventh points of error are overruled.

By its twelfth and thirteenth points of error, Hall challenges the legal and factual sufficiency of the evidence to support the jury's finding that Hall was negligent in failing to provide insurance coverage for Beach's lifting operations.

Several witnesses testified that an insurance agent should thoroughly acquaint himself with the client's business before he attempts to write the policy. This should be done so that the client will be covered for all risks associated with the operation of his business.

Witnesses also testified that the fact that a business operates large cranes should alert the agent that lifting coverage may be needed. Mr. Cox admitted that he didn't know what "lift risk" was when he wrote the insurance proposal. This evidence is sufficient to support the jury's finding of negligence. Hall's twelfth and thirteenth points of error are overruled.

By its fourteenth and fifteenth points of error, Hall contends that the evidence is legally and factually insufficient to support the jury's findings that Hall's actions were a producing cause of damages to Beach. As previously stated, the jury found that Hall violated the Insurance Code and the DTPA. The jury also found, in response to special issues 2, 4, and 6, that such violations were producing causes of damages to Beach. By its sixteenth and seventeenth points of error, Hall challenges the legal and factual sufficiency of the evidence to support the jury's finding that Hall's negligence was a proximate cause of damages to Beach.

The testimony of Mr. Lathrop previously set forth is sufficient to support the jury's finding of producing cause and proximate cause as to Beach's lost profits in the past. We do not reach the question of whether Hall's conduct was a producing or proximate cause of future lost profits because we have held that there was no evidence of such damages presented.

The damages for "financial loss due to the suit by Eljay Drilling," present a different problem. Essentially, Hall argues that its failure to provide coverage cannot be the producing or proximate cause of Eljay's consequential damages because Eljay would have incurred those damages even if the loss had been covered.

In order to pass on this point, we must examine the evidence of what the policy *would have provided* had one been issued. There are two lifting policies in the record. The first is the policy issued by the Hudson Company which, according to Mr. Horowitz, was to be matched by Hall for a lower price. (Mr. Horowitz testified that they "told them we wanted coverage like we had with Hudson.") This policy excluded liability "beyond the actual cash value of the property ... and shall in no event exceed what it would then cost to repair or replace the same with material of like kind and quality."

The second policy was obtained for Beach by Hall *after* the accident occurred. This policy has an exclusion almost identical to the one in the Hudson policy and further excludes "[l]oss of use, [i]nterruption of [b]usiness, loss of market, or damage or deterioration arising from delay...." Either of these exclusions would

preclude recovery of Eljay's consequential damages from Hall.

■ Special issue no. 18 pertained to Eljay's consequential damages. None of the damages found in special issue no. 18 are recoverable against Hall because Hall's conduct was not a producing or proximate cause of those damages.

In response to special issue no. 13, the jury found that Beach suffered $490,000.00 as "financial loss due to the suit by Eljay Drilling." We have reviewed the entire record and the jury's answers to all of the damages issues in order to determine how the jury arrived at its award of $490,-000.00. We have listed the possible components of the award below.

| | | |
|---|---|---|
| 1) | Market value of draw works | $200,000.00 |
| 2) | amount necessary to transport, disassemble, inspect the draw works, and repair the repairable components | 39,000.00 |
| 3) | transportation, cranes, welding, various service time involved in installing and modifying Rig No. 1 draw works on Rig No. 2 and rental draw works on Rig No. 1 | 61,000.00 |
| 4) | lost revenue on both Rig No. 1 and Rig No. 2 | 40,000.00 |
| 5) | Damage directly resulting from loss of profits caused by the failure of Beach to have insurance to cover the loss. | 19,000.00 |
| 6) | Eljay's attorneys' fees (trial, court of appeals, writ of error, writ granted) | 130,000.00 |
| | TOTAL | $489,000.00 |

■ Numbers 2, 3, 4, and 5, are Eljay's consequential damages, and, as a matter of law, are not recoverable by Beach against Hall. However, they still remain recoverable items of damage by Eljay against Beach. The $200,000.00, as the market value of the draw works, is recoverable by Beach. Hall's conduct was a producing cause of that damage. The jury was within its authority to award Beach $130,000.00 against Hall in order to compensate Beach for the attorney's fees that Beach would have to pay Eljay. "The fundamental principle underlying all rules of damages, other than punitive, is to indemnify the injured party for the pecuniary loss suffered, to place him as nearly as possible in the posi-

tion he would have occupied but for the injury." *State National Bank v. Farah Manufacturing Co.*, 678 S.W.2d at 698.

As a matter of law, the only damages which Beach could recover against Hall as "financial loss due to the suit by Eljay Drilling" are damages for the market value of the draw works ($200,000.00) and the attorney's fees awarded to Eljay in its claim against Beach ($130,000.00). Hall's fourteenth and sixteenth points of error are, in part, sustained; its fifteenth and seventeenth points as they relate to Beach's lost profits in the past are overruled. We do not reach the merits of the remaining portions of Hall's fifteenth and seventeenth points, which allege that the evidence was insufficient to support the jury's findings.

By points of error eighteen and nineteen, Hall contends that there is no evidence, or insufficient evidence "to support the jury's finding in response to Special Issue No. 13 that the damages found there were caused by the conduct of Hall." Hall makes the same claim with respect to the jury's answer to special issue no. 18 by points of error twenty and twenty-one.

Special issues 13 and 18 were not causation issues; they were damages issues. The jury did not determine causation by answering them. In any event, such contentions have already been discussed and ruled upon. Points of error eighteen through twenty-one are overruled.

By its twenty-second point of error, Hall contends that "the trial court erred in submitting a single Special Issue as to Beach's negligence damages, DTPA damages and Insurance Code damages." By its twenty-third point of error, Hall argues that "the trial court erred in trebling the damages awarded Beach against Hall because under the submission of damages the trial court was unable to determine the amount of damages attributable to the Insurance Code violations for the purpose of trebling."

The court's charge contained two Insurance Code [4] special issues and two producing cause issues, two DTPA issues and two producing cause issues, and one negligence issue and one proximate cause issue. The jury answered the Insurance Code issues, one of the DTPA issues, and the negligence issue in favor of Beach. The jury also found that the Insurance Code violations, the DTPA violation, and the negligence were the producing and proximate causes of damages to Beach. The jury found that the DTPA violation was *not* committed knowingly.

At the time this cause of action arose, the Insurance Code,[5] provided that "any plaintiff who prevails may obtain ... three times the amount of actual damages." There was no requirement that there be a "knowing" violation. The Code was amended in 1985 to require a finding that the violation was "knowingly committed." Tex.Ins.Code Ann. art. 21.21 § 16(b)(1) (Vernon Supp.1987). Hence, there was no issue submitted inquiring of a knowing commission as to the insurance code violations.

There was only one damages issue submitted. It requested that the jury determine the amount of damages, if any, "caused by the conduct" of Hall. The jury's answer totaled $2,130,000.00.

Hall argues that submitting only one issue on damages "prevents the trial court from knowing what portion of the damages is attributable to each cause of action and from knowing what portion of the damages to treble."

Beach argues that Hall has waived its right to complain of the submission of only one damages issue by failing to object to the charge on these grounds. Hall cites this Court's opinion in *Lucas v. Nesbitt*, 653 S.W.2d 883 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.), for the proposition that it did not need to object to the submission of only one damages issue.

In *Lucas*, special issues on DTPA violations and negligence were submitted and answered favorably to the plaintiff. They were also found to be the producing and proximate causes of damages. As in the case at bar, a single damages issue was submitted which asked the jury to award damages, if any, "resulting from the acts" of the defendant. The jury found $83,-000.00.

The trial court entered a judgment which *expressly* awarded $83,000.00 for negligence *and* $249,000.00 (3 × 83,000.00) for DTPA violations, for a total of $332,000.00. On appeal, the defendant argued that the damages awarded by the trial court's judgment were excessive.

We held that the damages were "obviously excessive." The judgment showed on its face that the trial court was awarding $83,000.00 for negligence *and* 3 times $83,000.00 for DTPA violations, clearly allowing an extra recovery of $83,000.00. *Id.* at 887.

The plaintiff in *Lucas*, as does the appellee in the case at bar, argued that the defendant had waived his right to complain of the damages issue by failing to object to it at trial. In *Lucas*, the complaint on appeal was that the damages awarded were excessive. We held that the waiver contention was "not persuasive in this instance," because the "Appellant cannot be held accountable for appellee's failure to secure separate jury findings on damages upon which an accurate judgment could be based." *Id.* The judgment rendered was not, as a matter of law, an "accurate judgment." The jury's verdict of $83,000.00 *could not* support the trial court's judgment of $332,000.00. The *Lucas* plaintiff would not have been able to foresee that the trial court would render such a judgment. It was not necessary for the plaintiff in *Lucas* to object to the charge in order to complain on appeal that the damages were excessive. *Lucas* was expressly limited to its facts and is not to be taken as authority for the proposition urged by Hall.

In the case before us, Hall certainly could have foreseen that any damages

---

**4.** *See* Tex.Ins.Code Ann. art. 21.21 § 4 (Vernon 1981).

**5.** Tex.Ins.Code, ch. 143 § 2(c), 1973 Tex.Gen. Laws, *amended by* Acts 1985, 69th Leg., p. 71, ch. 22 §§ 1 to 3, eff. April 4, 1985.

awarded by the jury would necessarily be comprised of damages for all causes of action upon which it was found liable. Based on the damages found by the jury, the judgment was not excessive.

■ Both of Hall's points of error complain about the damages issue. To raise such a complaint on appeal, Hall must have objected to the charge on the same basis. One "may not sit idly by in the trial court and, upon an unfavorable verdict, object to the court's charge for the first time in the appellate court." *Metro Ford Truck Sales, Inc. v. Davis*, 709 S.W.2d 785, 795 (Tex. App.—Fort Worth 1986, no writ). By failing to properly object to the charge, Hall has waived any error in the submission of only one issue on damages. *Ked-Wick Corp. v. Levinton*, 681 S.W.2d 851 (Tex. App.—Houston [14th Dist.] 1984, no writ). Hall's twenty-second and twenty-third points of error are overruled.

By its twenty-fourth point of error, Hall contends that special issue no. 18(3) contains a comment on the weight of the evidence. The issue read:

SPECIAL ISSUE NO. 18

If you find that Eljay Drilling Corporation has sustained additional damage, if any, resulting from the dropping of the draw works for the following, answer "yes" in Column 1.

> For each "yes" answer, if any, in Column 1, answer in dollars and cents in the corresponding space of Column 2.

| Column 1 | Column 2 |
|---|---|

\* \* \*

(3) Damage directly resulting from loss of profits caused by the failure of Beach to have insurance to cover the loss

[emphasis ours]

■ In order to be a direct comment, the issue must suggest to the jury the trial court's opinion concerning the matter about which the jury is asked. *City of Amarillo v. Langley*, 651 S.W.2d 906 (Tex.App.—Amarillo 1983, no writ). An is-

sue is objectionable if it assumes a disputed fact in issue. *Baker Marine Corp. v. Moseley*, 645 S.W.2d 486 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

■ Whether the policy covered the loss was a question of law. The trial court found that the policy did not cover the loss. Had it found otherwise, we assume it would have disregarded those jury findings inconsistent with its legal conclusion. We find no error. Point of error twenty-four is overruled.

By its twenty-fifth point of error, Hall argues that the trial court erred in refusing to submit its requested issues inquiring of Beach's negligence in failing to read the insurance policies.

■ Issues raised by the pleadings and supported by the evidence should be submitted to the jury. *Gomez v. Franco*, 677 S.W.2d 231 (Tex.App.—Corpus Christi 1984, no writ). In its answer, Hall affirmatively pled failure to read the policies as a defense. Mr. Horowitz admitted that he did not read the policies. We agree with Hall that its issues on failure to read the policies should have been submitted as to the negligence issue. However, the judgment must be upheld on any theory of recovery which is supported by the pleadings and sufficient evidence. That theory, in the case at bar, is violation of the Insurance Code.

Contributory negligence is a common-law defense. Common-law defenses may not be used to defeat recovery under the DTPA. *See Smith v. Baldwin*, 611 S.W.2d 611 (Tex.1980); *Joseph v. P.P.G. Industries, Inc.*, 674 S.W.2d 862 (Tex.App.—Austin 1984, writ ref'd n.r.e.). We find the reasoning for this rule equally applicable to Insurance Code claims. Therefore, any contributory negligence attributable to Beach could not defeat recovery on its Insurance Code claims. Hall's twenty-fifth point of error is overruled.

By its twenty-sixth and twenty-seventh points of error, Hall argues that special issue no. 13 should have limited Beach's damages to the amount of money "which would have been paid by the lift policy

which Beach contends would have covered the damage to the draw works less the cost of premiums for such policy."

The DTPA and the Insurance Code were enacted for the purpose of protecting consumers from unfair methods of competition and false, misleading, and deceptive business practices. Tex.Bus. & Com.Code Ann. § 17.44 (Vernon Supp.1987); Tex.Ins.Code Ann. art. 21.21 § 1(a) (Vernon Supp.1987). Both Acts allow the recovery of "actual damages." Tex.Bus. & Com.Code Ann. § 17.50(b)(1) (Vernon Supp.1987); Tex.Ins. Code Ann. art. 21.21 § 16(b)(1) (Vernon Supp.1987).

■ Although we have found no cases which define "actual damages" under the Insurance Code, we believe that the legislature intended that the term "actual damages" have the same meaning under both the DTPA and the Insurance Code. Therefore, we hold that an injured party, under the Insurance Code, may recover the greatest amount of actual damages alleged and factually established to have been caused by the unfair or deceptive practice. *See Kish v. Van Note*, 692 S.W.2d 463 (Tex. 1985). Actual damages means those recoverable at common law. *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931 (Tex.1980). Lost profits are "actual damages" as contemplated under either Act. *See Hycel, Inc. v. Wittstruck*, 690 S.W.2d at 922–23. Points of error twenty-six and twenty-seven are overruled.

By its twenty-eighth and final point of error, Hall contends that the trial court erred in refusing to admit evidence that Eljay was paid by its insurance carrier for the damage to the draw works. Hall claims that this evidence would have shown that Eljay was not damaged by Beach's failure to have insurance.

This point has essentially been rendered moot due to our determination of Hall's fourteenth and fifteenth points of error. In any event, we are not convinced that this evidence does not fall within the collateral source rule. *See generally, Brown v. American Transfer & Storage Co.*, 601 S.W.2d at 934. Hall's twenty-eighth point of error is overruled.

Since we have found no evidence to support some of the damages awarded in this case, we will render the judgment that the court below should have rendered. Tex.R. App.P. 80(b). Beach's recoverable damages are $240,000.00 (lost profits in the past), $200,000.00 (market value of draw works), and $130,000.00 (attorney's fees awarded to Eljay). The total of these actual damages is $570,000.00. This amount should be trebled under the Insurance Code, resulting in a total recovery for Beach of $1,710,000.00 plus attorney's fees as awarded by the trial court.

The judgment of the trial court is AFFIRMED IN PART as to Eljay Drilling Corp. and Employers Insurance of Wausau, and REVERSED AND RENDERED IN PART AND AFFIRMED IN PART as to Beach, Inc., in conformity with this opinion.