United States Court of Appeals,

Fifth Circuit.

No. 93-8421.

Sam B. HILLER, et al., Plaintiffs,

Federal Signal Corp., Plaintiff-Appellant,

v.

MANUFACTURERS PRODUCT RESEARCH GROUP OF NORTH AMERICA, INC.,
Intervenor-Plaintiff-Appellee,

v.

DURAVISION, INC., et al., Defendants,

Duravision, Inc., Defendant-Appellee.

DURAVISION, INC., et al., Plaintiffs,

Duravision, Inc., Plaintiff-Appellee,

v.

FEDERAL SIGNAL CORP., Defendant-Appellant.

Aug. 4, 1995.

Appeal from the United States District Court for the Western District of Texas.

Before GARWOOD and EMILIO M. GARZA, Circuit Judges, and HEAD, District Judge.[*]

EMILIO M. GARZA, Circuit Judge:

Federal Signal Corporation ("Federal") appeals from a judgment entered against it after trial before a jury. After finding Federal liable for fraud and violations of the Texas Deceptive Trade Practices and Consumer Protection Act ("DTPA"), Tex.Bus. & Com.Code Ann. §§ 17.41-17.63 (Vernon 1987), the jury awarded

---

[*]District Judge for the Southern District of Texas, sitting by designation.

Duravision, Inc. ("Duravision") and Manufacturers Product Research Group of North America, Inc. ("MPR") compensatory damages for lost profits, and punitive damages. Federal appeals this damage award, and we vacate and remand.[1]

I

In 1987 Marc Johnson was hired by an advertising company called Rollavision, U.S.A., Inc., which was in the business of selling ads displayed on large video units in grocery stores, banks, airports, and other public places frequented by consumers. Film inside each machine rotated periodically, displaying in succession as many as twenty-five to thirty advertisements. Johnson worked as an ad salesman for Rollavision from October 1987 to December 1987, and his exposure to Rollavision influenced him to start a business of his own, selling ads for machines like the ones used by Rollavision.

After leaving Rollavision, Johnson met with representatives of Federal, and informed them that he wanted to develop a display machine, for placement in public establishments, which would handle multiple ads and display them frequently during the day. Federal represented to Johnson that it was well-equipped to design and manufacture a device which would meet his needs. Johnson

---

[1]The opinion of the Court consists of the following: parts I, II.A.1, II.A.3, II.B, and II.C, and part II.A.2 to the extent that it holds that the evidence did not establish certain categories of lost profits with reasonable certainty. The remainder of part II.A.2 constitutes my concurrence in part and dissent in part to the decision of the Court, *see* Garwood, J., concurring in part and dissenting in part, *infra,* to remand for retrial of all damages.

incorporated Duravision, Inc., and ten days later Duravision and Federal agreed that Federal would construct twenty display machines capable of housing from eight to forty transparency frames, and Duravision would buy the units for $3,100 each. An addendum to that agreement, executed several months later, provided that Federal would not sell a Duravision display machine to anyone other than Duravision, as long as Duravision purchased at least 100 signs every twelve months.

Duravision then began marketing the machines, assigning to MPR the exclusive right to buy Duravision displays from Federal for export to Mexico and to all of South America except Colombia. In return Duravision was to receive one-half of MPR's profits on the resale of the machines, as well as one-half of any license fees received by MPR. A Mexican firm, Servicios Tecnicos Orientados al Commercio ("STOC"),[2] agreed to purchase Duravision machines from MPR, and to pay MPR a franchise fee, as well as a licensing fee for each machine it bought. Gran Bazar—a major retailer in Mexico City—agreed to lease a number of Duravision units from STOC for installation in its stores. Ricardo Guerra purchased from MPR the exclusive right to market the Duravision concept in South America, Central America, and the Caribbean, except for Colombia, agreeing to buy Duravision machines from MPR and to pay MPR a franchise fee, as well as a licensing fee for each machine purchased. Duravision also granted a franchise to an Arkansas firm known as Duravision of

---

[2]STOC was run by Alfonso Moran and Alejandro Amescua. Amescua is a cousin of Rodolfo Velasco, the president of MPR.

3

America, Inc. ("the Arkansas franchisee"), agreeing to sell Duravision machines to the Arkansas franchisee at cost plus $1000, in return for a 6% royalty on any revenues the franchisee might earn.

These arrangements all came to nought, however, when it became apparent that Federal was unable to produce a working Duravision machine as promised. Despite continual reassurances of the impending completion of the project and the quality of the machines, Federal never delivered a working Duravision sign. As a result, all prospects for the distribution of the Duravision displays were lost.

This litigation ensued, with Duravision and MPR asserting claims for fraud and violations of the Texas DTPA. The case was tried before a jury, which found Federal liable and awarded Duravision and MPR compensatory damages for lost profits in the amounts of $3,995,000, and $4,750,000 respectively. The jury also awarded punitive damages of $4,500,000 each to Duravision and MPR. The magistrate judge entered judgment on the jury verdict and awarded Duravision and MPR prejudgment interest.[3]

Federal appeals, contending that (a) the jury's findings of lost profits must be set aside, and the corresponding damage award reversed, because MPR's and Duravision's recovery of lost profits is precluded by Texas law, and because the lost profits were not proved with reasonable certainty; (b) it is entitled to a new

_____

[3]The parties consented to have the case tried before a United States Magistrate Judge.

4

trial because the district court committed reversible error by excluding from evidence Plaintiff's Exhibits 51 and 51a;  (c) the award of punitive damages must be set aside, because there was neither evidence nor a jury finding that Duravision or MPR was injured in tort;  and (d) the magistrate judge's award of prejudgment interest must be set aside.

## II

### A

Federal contends that the jury's finding of Duravision's and MPR's lost profits must be set aside, and the damage award for those lost profits must be reversed, because (1) Texas law does not permit unestablished or unprofitable businesses, such as Duravision and MPR, to recover damages for lost profits;  (2) Duravision and MPR failed to prove lost profits with reasonable certainty;  and (3) the statute of frauds prevents Duravision and MPR from recovering profits.

#### 1

##### a

Before we address Federal's first argument, we clarify whether Duravision and MPR can recover *any* lost profits under Texas law.  Texas common law traditionally awarded only out-of-pocket costs in fraud cases.  *Morriss-Buick v. Pondrom,* 131 Tex. 98, 113 S.W.2d 889 (1938);  *see also Camp v. Ruffin,* 30 F.3d 37 (5th Cir.1994) (rejecting benefit-of-the-bargain damages in common-law fraud action).  That measure, however, is no longer exclusive. With the enactment of the DTPA, Texas expanded the allowable

5

methods by which damages in a fraud case can be measured, and today, Texas common law allows "either the "out-of-pocket' or the "benefit of the bargain' damages, whichever is greater." *W.O. Bankston Nissan, Inc. v. Walters,* 754 S.W.2d 127, 128 (Tex.1988).[4] Fraud victims are "also entitled to recover for pecuniary loss suffered otherwise as a consequence of [their] reliance upon the misrepresentation." *Texas Commerce Bank Reagan v. Lebco Constructors, Inc.,* 865 S.W.2d 68, 73 (Tex.App.—Corpus Christi 1993, writ denied).[5] Where properly proven, that is, not speculative, these special damages can include lost profits.[6] Consequently, Texas law does allow the recovery of lost profits in DTPA cases, and Duravision and MPR are not precluded *per se* from proving and recovering lost profits.

---

[4]*See also Leyendecker & Assocs., Inc. v. Wechter,* 683 S.W.2d 369 (Tex.1984) (acknowledging that Texas common law allows "out of pocket' damages, but also stating that Texas law also allows "benefit of the bargain' damages under the DTPA); *Streller v. Hecht,* 859 S.W.2d 114, 116 (Tex.App.—Houston [14th Dist.] 1993, writ denied) ("Our common law allows recovery of either the benefit of the bargain measure of damages or out of pocket losses in fraud claims."); *Hedley Feedlot, Inc. v. Weatherly Trust,* 855 S.W.2d 826, 840 (Tex.App.—Amarillo 1993, writ denied) (same as *Streller* ).

[5]*See also Airborne Freight Corp. v. C.R. Lee Enters., Inc.,* 847 S.W.2d 289, 295 (Tex.App.—El Paso 1992, writ denied) ("[T]he plaintiff is entitled to recover "special' or "consequential' damages shown to be the proximate result of the misrepresentation.").

[6]*See White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983) (allowing recovery of lost profits in DTPA case); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 933 (Tex.1983) (allowing recovery for lost profits in fraud action); *Lebco,* 865 S.W.2d at 74 (allowing contractor to recover lost compensation and lost profits when property owner with whom he had contracted induced him to begin construction by fraudulently misrepresenting the status of the development loan).

Federal first argues that "as a matter of law" neither Duravision nor MPR may recover damages for lost profits, because neither company was an established, profitable business at the time of the transactions in question. Federal points out that Duravision was incorporated less than one month before it entered into the Display Sales Agreement, and has never made a profit; and that MPR has never made a profit, although it had been in business for several years when the transactions at issue here occurred.[7] Federal argues that "under Texas law, an unestablished business is not entitled to recover lost profits."[8]

A number of decisions of this Court and the Texas courts indicate that businesses lacking a history of profitability may not recover lost profits under Texas law. However, in light of the most recent decisions on this subject, we conclude that this Texas rule is not an absolute one. Under Texas law a business's failure to demonstrate a history of profitability should be considered, but is not independently dispositive, in deciding whether lost profits

---

[7]Rodolfo Velasco testified that although MPR "never showed a profit from 1984 until 1988," during those years "it was break even." Record on Appeal, vol. 27, at 5.

[8]The issue which Federal raises is one of state law, and we review *de novo* the district court's resolution of that issue. *See Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1225, 113 L.Ed.2d 190 (1991) ("The obligation of responsible appellate review and the principles of a cooperative judicial federalism underlying [*Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ] require that courts of appeals review the state-law determinations of district courts *de novo.*"). The parties agree that the issue is governed by Texas law.

may be recovered.

The Supreme Court of Texas recently stated:

> [W]here it is shown that a loss of profits is the natural and probable consequence[ ] of the act or omission complained of, and their amount is shown with sufficient certainty, there may be a recovery therefor.... It is not necessary that profits should be susceptible of exact calculation, it is sufficient that there be data from which they may be ascertained with a reasonable degree of certainty and exactness.... "In order that a recovery may be had on account of loss of profits, the amount of the loss must be shown by competent evidence with reasonable certainty."

*Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994) (quoting *Southwest Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098 (1938)). The court also quoted a passage from *Southwest Battery* which indicates that new and unestablished businesses may not recover lost profits: "The rule denying a recovery ... where the enterprise is new or unestablished, is still enforced, on the ground that the profits which might have been made from such business are not susceptible of being established by proof to that degree of certainty which the law demands." *Id.* (quoting *Southwest Battery,* 115 S.W.2d at 1099).

Several of our decisions indicate that the new and unestablished business rule is a strict one, always denying recovery to businesses which have failed to show a history of profits. *See Fiberlok, Inc. v. LMS Enters., Inc.,* 976 F.2d 958, 962 (5th Cir.1992) (stating that "prospective profits are not recoverable for a newly established business or for a business that has operated at a loss" and explaining that "[t]he former has no track record, and the latter is an established loser"); *Golden Bear Distributing Sys. of Texas, Inc. v. Chase Revel, Inc.,* 708

8

F.2d 944, 951 (5th Cir.1983) (stating categorically that "Texas law permits the recovery of the expected profits of a business *only* if "there was some data and history of profits from an established business' " (emphasis added) (quoting *Atomic Fuel Extraction Corp. v. Slick's Estate,* 386 S.W.2d 180, 188 (Tex.Civ.App.—San Antonio 1964), *writ ref'd n.r.e. per curiam,* 403 S.W.2d 784 (Tex.1965) (explicitly withholding approval of holding that only nominal damages might be recovered))); *Keener v. Sizzler Family Steak Houses,* 597 F.2d 453, 458 (5th Cir.1979) (stating that "[u]nder Texas law prospective profits *are not recoverable* for a newly established business or for a business which has operated at a loss" (emphasis added)), *cited in Golden Bear,* 708 F.2d at 951 ("accord"); *Fredonia Broadcasting Corp., Inc. v. RCA Corp.,* 481 F.2d 781, 803 (5th Cir.1973) (stating "the well-established rule that prospective profits from a new enterprise which has no history of profits are too remote and speculative to be included in compensatory damages" (quoting *Southwest Bank & Trust Co. v. Executive Sportsman Ass'n,* 477 S.W.2d 920, 929 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.))).

Our statements to that effect were supported by the teaching of the Texas courts of appeals. Most notably, in *Atomic Fuel Extraction Corp. v. Slick's Estate,* the San Antonio Court of Civil Appeals explained:

> Since the decision in Southwest Battery Corporation v. Owen, Texas has permitted recovery of lost profits to a business that can prove it is established and making profits at the time a contract is breached or a tort committed. That case explains that pre-existing profits, together with other facts and circumstances, may supply the reasonable certainty

9

required both as to the fact of damages and the amount. The success of an enterprise, measured in profits, is dependent upon a multitude of risks, chances and circumstances; and without some history of profits there is inadequate data upon which to prove the fact of damages with the certainty required. A new and unestablished business without a profit record leaves too much to conjecture and speculation.

*Id.,* 396 S.W.2d at 188 (citation omitted). The court in *Atomic Fuel,* citing numerous decisions, observed that "[i]n those Texas cases which have permitted recovery, there was some data and history of profits from an established business," and "[i]n sharp contrast with those precedents are those which have consistently denied future profits when the business was new and unestablished." *Id.* at 188-89, *quoted in Fredonia Broadcasting,* 481 F.2d at 803. The court stated that "[p]roof of an operation of a business at a loss fails to meet the test." *Id.* at 189; *see also First Texas Sav. Ass'n v. Dicker Ctr., Inc.,* 631 S.W.2d 179, 187 (Tex.App.—Tyler 1982, no writ); *Ganda, Inc. v. All Plastics Molding, Inc.,* 521 S.W.2d 940, 943 (Tex.Civ.App.—Waco 1975, writ ref'd n.r.e.); *Executive Sportsman Ass'n,* 477 S.W.2d at 929.

However, several recent decisions of Texas courts of appeals indicate that the absence of a history of profitability is not dispositive of the issue of recovery of lost profits; rather it is one consideration, and lost profits may be recovered, even absent a history of profitability, if other evidence establishes lost profits with reasonable certainty. The court of appeals stated that conclusion quite clearly in *Orchid Software, Inc. v. Prentice-Hall, Inc.,* 804 S.W.2d 208 (Tex.App.—Austin 1991, writ denied). There the court stated that "more recent cases have held that a new

10

business may use other data besides past profit history to show anticipated profits to a reasonable certainty," and held "that the absence of a history of profits does not, by itself, preclude a new business from recovering lost future profits."  *Id.* at 210-11.[9]

The court of appeals in *Pena v. Ludwig,* 766 S.W.2d 298 (Tex.App.—Waco 1989, writ requested), stated that although "[l]ost profits of a new or unestablished business generally cannot be proved to a reasonable certainty due to the absence of a prior base period for comparison[,] ... lost profits may be recovered for a new enterprise, if factual data is otherwise available to furnish a sound basis for computing probable losses."  *Id.* at 301 (citations omitted).  The court explained that "[w]hether the evidence is sufficient to support a finding of lost profits must be determined from the facts of each case."  *Id.*

In *Frank B. Hall & Co. v. Beach, Inc.,* 733 S.W.2d 251 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.), the appellant argued—as does Federal here—that the jury's damage award had to be reversed because "a "business which operates at a loss ... cannot recover lost profits.' "  *Id.* at 257.  The court of appeals rejected that argument, noting that "Beach did not contend ... Hall's conduct caused it to suffer another year of operating at a loss.  Rather, Beach sought to prove that Hall's conduct caused it to lose *specific* business from which it would have realized a

---

[9]*See also Wissman v. Boucher,* 150 Tex. 326, 240 S.W.2d 278, 281 (1951) (stating that "the *normal* criterion" for recovery of lost profits is "an established record of profits made prior to the act which is the basis of damage claim" (emphasis added)).

11

certain profit."  *Id.*  The court explained that "[i]t is entirely possible that a business can make a profit on individual jobs, yet still end up with a net year-end loss.  Furthermore, simply because a business may have a net loss does not mean that it cannot suffer *further* damage at the hands of another."  *Id.* at 258.[10]

We are not aware of any decision of the Texas Supreme Court that expressly decides whether the failure to demonstrate a history of profitability—by itself—bars the recovery of lost profits. However, the Texas Supreme Court's recent decision in *Texas Instruments, Inc. v. Teletron Energy Management, Inc.* is instructive.  There the court stated:

> The requirement of "reasonable certainty" in the proof of lost profits is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise....  "Profits are not always speculative and remote. Whether in a given case they should be so classified depends altogether upon the facts and circumstances of that particular case."  ...  "What constitutes reasonably certain evidence of lost profits is a fact intensive determination."[11]

---

[10]The court of appeals in *Hall* overturned the jury's damage award on other grounds.  *See Hall,* 733 S.W.2d at 258-59 (noting that verdict was based on estimates of lost profits which were not supported by "objective facts, figures, or data").

[11]The court also stated:

> This does not mean, however, that the "reasonable certainty" test lacks clear parameters.  Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered.  *Factors like these and others* which make a business venture risky in prospect *preclude recovery of lost profits* in retrospect.

*Teletron,* 877 S.W.2d at 279 (emphasis added).  The Texas

12

*Teletron,* 877 S.W.2d at 279 (quoting *Southwest Battery,* 115 S.W.2d at 1099; *Whiteside v. Trentman,* 141 Tex. 46, 170 S.W.2d 195, 197 (1943); *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992)). Furthermore, although emphasizing that the plaintiff in *Teletron* had never operated at a profit,[12] the Texas Supreme Court did not end its analysis there. The court also emphasized that the case before it involved "the proposed sale of a new and unique product which had never been sold before," and the production of which appeared not to be feasible.[13] Although the absence of profit history was an important consideration in *Teletron,* the court did not list it as a factor which precluded recovery of lost profits, and stated that "[t]he focus is on the experience of the persons involved in the enterprise and the nature of the business activity, and the relevant market." *Id.* at 280.

---

Supreme Court's reference to "clear parameters," and "factors" which "preclude recovery of lost profits," appears compatible with a strict rule denying recovery whenever a business fails to prove a history of profits: the court's list of factors which preclude recovery was not exhaustive, *see id.* (referring to "[f]actors like these *and others* " (emphasis added)), and the absence of a profit history arguably could be one such factor. However, the court's analysis of the evidence in *Teletron* leads us to conclude that treating the absence of profit history as one consideration—but not a dispositive one—is more consistent with the Texas Supreme Court's view of the reasonable certainty requirement.

[12]*See id.* at 280 (distinguishing *Southwest Battery* and *Pace Corp. v. Jackson,* 155 Tex. 179, 284 S.W.2d 340 (1955)—two cases where recovery of lost profits was permitted—based on the fact that "[t]he businesses in [those] cases actually operated at a profit," whereas the plaintiff in *Teletron* "never did").

[13]*See id.* at 281 (pointing out that *Pace* and *Southwest Battery* "involved the sale of established products").

We follow the *Teletron* court's example by declining to treat the absence of a profit history, on the part of either Duravision or MPR, as dispositive of the recoverability of lost profits. We hold that the absence of a history of profitability, like the fact that a business is new, is "but one consideration."[14] *Id.* Several of our decisions indicating a contrary result—*Golden Bear, Keener,* and *Fredonia Broadcasting*—preceded the decisions in *Teletron, Orchid Software, Frank B. Hall,* and *Pena,* and therefore do not reflect the recent trend in Texas law which the latter cases

---

[14]Although the court in *Teletron* stated that "[t]he rule denying a recovery ... where the enterprise is new or unestablished, is still enforced," *id.,* 877 S.W.2d at 279 (quoting *Southwest Battery,* 115 S.W.2d at 1099), the court also explained that a new business is not absolutely barred from recovering lost profits simply because it is new:

> *The fact that a business is new is but one consideration in applying the "reasonable certainty" test.* In Southwest Battery the Court endorsed enforcement of a rule denying recovery of lost profits "where the enterprise is new or unestablished." But this rule does not deny recovery by a new business simply because it is new; it denies recovery "on the ground that the profits which might have been made from such businesses are not susceptible of being established by proof to that degree of certainty which the law demands." The mere hope for success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits. *When there are firmer reasons to expect a business to yield a profit, the enterprise is not prohibited from recovering merely because it is new.*

*Id.* at 280. Also, according to *Teletron,* the new or unestablished " "enterprise' referred to in Southwest Battery is not the business entity, but the activity which is alleged to have been damaged." *Id.* In light of that language we reject Federal's argument that Duravision is barred from recovering lost profits because it was incorporated only a matter of days before the agreement with Federal.

represent.  Because our 1992 decision in *Fiberlok* is more recent than *Orchid Software, Hall,* and *Pena,* we regard *Fiberlok* as declining to adopt the view of Texas law which those cases represented.  However, the Texas Supreme Court's decision in *Teletron* implicitly approved the approach which was taken in *Orchid Software, Hall,* and *Pena.*  Therefore, to the extent that the view of Texas law expressed here represents a departure from that in *Fiberlok,*[15] we believe such a departure is justified by the decision in *Teletron.*

2

Deciding whether the evidence is sufficient to prove lost profits with reasonable certainty requires a detailed discussion of the facts.  "Recovery for lost profits does not require that the loss be susceptible of exact calculation.  However, ... [t]he amount of the loss must be shown by competent evidence with reasonable certainty."  *Holt,* 835 S.W.2d at 84 (citations omitted).  "As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained."  *Id.*  Federal argues that most of the lost profits awarded by the jury were not proved with reasonable certainty, but were merely hoped for by Duravision and MPR.  Duravision and MPR respond that they proved lost profits via

---

[15]*But see Fiberlok,* 976 F.2d at 963 (describing the rule denying recovery for new and unestablished businesses as "the general rule," and stating that that rule "does not apply to a business established on the basis of a contract sufficiently specific in nature as to allow credible prediction of the amount of lost profits, particularly if factual data is available to furnish a sound basis for computing probable loss").

specific contracts which would have earned revenues in Mexico, South America, and Arkansas, but which were cancelled because of Federal's failure to deliver the Duravision machines.

a

The jury awarded Duravision $3,995,000 in damages—almost exactly the figure presented by Duravision's expert, Christopher Pflaum. Pflaum computed Duravision's damages to be $3,994,902, based on lost profits from sales of display machines, leases of display machines, sales of advertising, license fees, and franchise fees, in Mexico, Arkansas, and South America, less operating expenses. Similarly, the jury awarded MPR almost exactly the amount of damages testified to by MPR's damages expert, Timothy Ray Moore. Moore testified that MPR suffered $4,751,530 in damages, based on lost profits from sales and leases of display machines, sales of advertising, license fees, and franchise fees in Mexico, South America, and Arkansas, less operating expenses. The jury awarded MPR $4,750,000 in damages. Because the amounts of damages awarded by the jury so closely approximated the amounts testified to by Pflaum and Moore, we regard the jury's verdict as finding that the amounts testified to by the experts were correct.

"The standard for appellate review of a jury's verdict is exacting." *Chemical Distrib., Inc. v. Exxon Corp.,* 1 F.3d 1478, 1483 (5th Cir.1993).

> "The verdict must be upheld unless the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable [individuals] could not arrive at any verdict to the contrary. If there is evidence of such quality and weight that reasonable and fair minded [individuals] in the exercise of impartial judgment might reach different

16

conclusions, the jury function may not be invaded."
*Id.* (quoting *Granberry v. O'Barr,* 866 F.2d 112, 113 (5th Cir.1988)). Therefore, we must decide whether a reasonable person could find that Duravision's and MPR's lost profits were not speculative, but were proved with reasonable certainty. "[W]e are bound to view the evidence and all reasonable inferences in the light most favorable to the jury's determination." *Rideau v. Parkem Indus. Serv., Inc.,* 917 F.2d 892, 897 (5th Cir.1990). "Even though we might have reached a different conclusion if we had been the trier of fact, we are "not free to reweigh the evidence or to re-evaluate credibility of witnesses.' " *Id.* (quoting *Glass v. Petro-Tex Chem. Corp.,* 757 F.2d 1554, 1559 (5th Cir.1985)).

The Duravision concept was marketed in four main areas—in Mexico, via S.T.O.C.; in Mexico, via an agreement with the Gran Bazar retail chain;[16] in South America, by way of an agreement with Ricardo Guerra; and in Arkansas, through the Arkansas franchisee, Duravision of America, Inc. The future profits which Duravision and MPR would have earned in each of these areas are in dispute, and we will examine each one separately.

b

Servicios Tecnicos Orientados al Commercio

In the summer of 1988 MPR acquired from Duravision the exclusive rights (1) to purchase Duravision displays from Federal for export to Mexico, and (2) to market the machines in Mexico.

---

[16]The Gran Bazar lease agreement was engineered by STOC, but will be addressed separately from STOC's sales of Duravision machines.

MPR agreed to pay Duravision one half of all licensing fees from the Duravision concept, as well as one half of all profits from the sale of Duravision machines.

Shortly thereafter MPR transferred to STOC the exclusive right to market the Duravision idea in Mexico. Alejandro Amescua and Alfonso Moran, representing STOC, signed a letter approving the following conditions of the agreement: (1) STOC would acquire Duravision machines from MPR at the rate of $3500 per machine; (2) for each machine imported into Mexico, STOC would pay MPR an annual license fee of $1000 for the first year, to be negotiable thereafter but not to be less than $1000; and (3) STOC would buy a minimum of 100 Duravision machines during a period of 12 months. *See* Record on Appeal, Defendant's Exhibit D-129.

Several days later Moran, on behalf of STOC, sent a letter to MPR agreeing to the following additional terms "as a compl[e]ment" to the prior agreement: (1) that the cost of the exclusive right to market the Duravision concept in Mexico would be $175,000; and (2) that the cost of the license would be $1000 per machine per year "for the first three years," but would be negotiated for the subsequent years. *See id.* Defendant's Exhibit D-130.

On July 30, 1988, Moran wrote Duravision a "formal letter of intent to buy ... a minimum of eight hundred (800) "Duravision displays' " that year, "to be delivered in the next six months," for $3500 each. *See id.* Defendant's Exhibit D-140. The terms of the formal letter of intent were reiterated by a letter from Moran to Duravision the following month, in which Moran stated: "By

18

accepting these terms you will assure us that nobody will be able to purchase these Signs from you for the purpose of exporting them into Mexico."  Moran also indicated that in light of STOC's contacts with public transit authorities in Mexico City, "very probably the amount of eight hundred displays ordered w[ould] be increased to around 1,200 displays the first year."[17]  *See id.* Defendant's Exhibit D-141.

Based on the foregoing information, Pflaum and Moore calculated the profits that Duravision and MPR would have earned if Federal had provided the Duravision display machines that it had promised.  Pflaum prepared a chart, based on projected sales of 800 units,[18] which represented that Duravision would have received the following revenues:

    (i) $87,500 Duravision's half of the $175,000 fee to be paid
         by STOC to MPR for the exclusive right to market the
         Duravision concept in Mexico;

    (ii) $1,100,000 Duravision's half of the license fees to be
         paid by STOC to MPR each year for a period of three
         years, on each machine imported into Mexico by STOC;[19]

---

[17]*See also* Defendant's Exhibit D-131 (setting out additional terms as a "complement" to the MPR-STOC agreement, and stating that STOC's "needs ... estimated for the first year, could be approximately ... 800 to 1200 units").

[18]Pflaum prepared two charts, one of which was based on sales of 1200 units, the other on sales of 800 units.  The jury's verdict reflects that the jury did not accept Pflaum's calculations based on sales of 1200 units.

[19]If 800 machines had been sold, and STOC had paid MPR $1000 per machine per year for three years, the total license fee paid to MPR would have been $2,400,000 (800 machines × $1000 × 3 years = $2,400,000).  Pflaum arrived at a lower amount, $2,200,000, by allowing for the time required to deliver all of the 800 machines to Mexico.  In late July of 1988 Moran wrote STOC's formal letter of intent to purchase 800 machines, to be delivered within six

(iii) $400,000 Duravision's half of the profits to be received by MPR on the sale of 800 units to STOC for $3500 each: Pflaum figured that Federal would sell each unit to MPR for $2500, and that MPR would therefore earn a profit of $1000 on each unit, resulting in a total profit on sales of $800,000.

The total of all of the foregoing is $1,587,500.

Moore's calculation of MPR's lost revenues differed from Pflaum's calculations in the important respect that Moore based his numbers on sales of 1200 machines. In other important respects Moore's calculations mirrored Pflaum's.[20] Moore prepared a chart, based on sales of 1200 units, which represented that MPR would have earned the following revenues:

(i) $87,500 MPR's half of the $175,000 fee paid by STOC to MPR for the exclusive right to market the Duravision concept in Mexico;

(ii) $1,800,000 MPR's half of the license fees to be paid by STOC to MPR each year for a period of three years, on

_____

months. Pflaum assumed "that by the end of 1989, all eight hundred machines would be in place." Record on Appeal, vol. 38, at 29. Consequently, according to Pflaum's calculations, 1990 would be the first year in which license fees of $1000 per machine would be received for all 800 machines. Pflaum calculated that $800,000 in license fees would be received by MPR in each of 1990 and 1991, but only $600,000 would be received by the end of 1989. Hence the figure $2,200,000 ($600,000 + $800,000 + $800,000 = $2,200,000), of which Duravision's one half share would have been $1,100,000. Pflaum's allowance for delivery time is not challenged on appeal.

[20]The jury's verdict is inconsistent to the extent that it awarded damages to Duravision based on the sale of 800 Duravision machines, but awarded damages to MPR based on the sale of 1200 machines. Because Duravision and MPR agreed to divide equally the profits from the sale of all machines, the jury verdict is unsupported by the evidence to the extent that it implicitly finds MPR would have earned revenues based on the sale of an additional 400 machines. However, because the parties present no argument as to this issue it is not properly before the Court.

each machine imported into Mexico by STOC;[21]

      (iii) $600,000 MPR's half of the profits to be received by MPR on the sale of 1200 units to STOC for $3500 each: Moore figured that Federal would sell each unit to MPR for $2500, and that MPR would therefore earn a profit of $1000 on each unit, resulting in a total profit on sales of $1,200,000

The total of the foregoing revenues is $2,487,500.

i

Federal initially challenges these damages calculations by arguing that MPR and Duravision failed to establish with reasonable certainty that any of the 1200 Duravision machines could have been sold.[22] Although I agree as to any sales in excess of 800 machines, I conclude that sufficient facts and figures indicated the future sale of 800 machines to permit recovery of corresponding lost profits.

---

[21]Unlike Pflaum, Moore did not allow for the time required to deliver all of the machines he anticipated would be purchased by STOC. Neither his failure to do so—nor the jury's finding accepting his calculations to that effect—is challenged on appeal. Moore simply calculated that $1000 would be paid on each of 1200 machines every year for three years, resulting in a total receipt by MPR of $3,600,000 ($1000 × 1200 machines × 3 years = $3,600,000). MPR's half of that sum would, of course, be $1,800,000.

[22]Arguably, the machines could not even have been bought from Federal under the terms of the parties' agreements, since the record contains no evidence of a contract binding Federal to produce all the Duravision displays that the jury's damage award was based on. Duravision and MPR's claims for lost profits are necessarily predicated not only on the demand for Duravision machines, but also on their ability to meet that demand. Consequently, the absence of evidence that Federal was contractually bound to produce the hundreds of machines which formed the basis of the jury's verdict calls into question the certainty of the lost profits which the jury found. However, Federal does not argue that Duravision's and MPR's lost profits were, for that reason, not proved with reasonable certainty. That argument is therefore waived.

21

MPR's expert, Moore, computed lost profits on the basis of 1200 machines, which Moran mentioned in a letter to Duravision. In that letter Moran stated: "Also be informed that we contacted the officers in the Subway System in Mexico City and the Airport management and very probably the amount of eight hundred displays ordered will be increased to around 1,200 displays the first year." Record on Appeal, Defendant's Exhibit D-141. The only other indication that 1200 machines would be purchased by STOC is found in an earlier letter from Moran to MPR, in which Moran stated that STOC's "estimated" "needs" for the first year "could be approximately ... 800 to 1200 units." Record on Appeal, Defendant's Exhibit D-130.

Moran's statements of an approximate number of machines which he "could" need, and which he "very probably" would order, does not provide the degree of certainty which is required for recovery of lost profits. "As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Holt,* 835 S.W.2d at 84. "We cannot uphold an award of damages based on speculation." *Hall,* 733 S.W.2d at 259 (overturning jury verdict where evidence supporting finding of lost profits was estimate, unsupported by underlying facts, of "about" how much plaintiff could have made); *see also Fenwal, Inc. v. Mencio Sec., Inc.,* 686 S.W.2d 660, 665 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.) (overturning jury verdict where evidence supporting lost profits was statement that company would do "in the neighborhood of $300,000 in gross sales"

22

and profit would be "in the neighborhood of about I guess $60,000"). Moran's statements regarding the purchase of 1200 machines are unsupported by any underlying facts, and are patently speculative.[23] As such they are insufficient to prove with reasonable certainty any lost profits from the sale of Duravision machines over 800 units, and the jury's verdict awarding MPR lost profits must be modified accordingly. MPR may not recover lost profits from sales or from license fees for any of the 400 machines erroneously included in Moore's calculations.

As to the remaining 800 signs, however, I reject Federal's arguments. First of all, I conclude that a binding contract was entered into between STOC and MPR which entitled MPR to the sale of 100 Duravision machines during the first year of the contract. A letter from Moran to MPR specifically stated, "the minimum quantity ... will be the buying of 100 units." A binding contract which

---

[23]Several witnesses at trial inadvertently referred to Moran's statements as an order for 1200 machines. *See* Record on Appeal, vol. 25, at 152 (where Moran testified that he "place[d] an order" with Duravision for 800 machines, and that "order g[o]t increased to twelve hundred machines"); *id.* vol. 24, at 87 (where Rodolfo Velasco testified that "STOC increase[d] the number of signs it was ordering from duravision and M.P.R. group ... from eight hundred to twelve hundred units"); *id.* vol. 26, at 99 (where Moran testified that he "decided to increase the order by another four hundred"). In light of the explicit terms of Moran's correspondence, the foregoing testimony does not support the conclusion that either of Moran's letters amounted to an order for 1200 machines. *See generally* Fed.R.Evid. 1002 ("To prove the content of a writing ... the original writing ... is required, except as otherwise provided in these rules or by Act of Congress."), 1004 (providing that "[t]he original is not required, and other evidence of the contents of a writing ... is admissible if" the original is lost, destroyed, not obtainable, in the possession of the opposing party, or not closely related to a controlling issue).

would have resulted in ascertainable profits can satisfy the plaintiff's burden of proving lost profits with reasonable certainty. *See Holt,* 835 S.W.2d at 85 (stating that plaintiffs "could have supported their lost profits with testimony that they had lost out on *specific* contracts"); *Fleming Mfg. Co. v. Capitol Brick, Inc.,* 734 S.W.2d 405, 407 (Tex.App.—Amarillo 1987, writ ref'd n.r.e.) (stating that "[p]roof of existing contracts for ten inch bricks ... would have satisfied th[e] burden" of proof with reasonable certainty).[24]  A binding agreement between MPR and STOC for the purchase of 100 units proved those sales with reasonable certainty in this case.

The remaining units upon which Pflaum based his calculations were the subject of Moran's formal letter of intent.  Although apparently not a binding contract, neither is Moran's letter of intent a mere statement of opinion or conjecture, as was his reference to a probable order of 1200 machines.  Moran stated his intent to purchase a specific number of machines (800) for a stated price ($3500 each) within a definite time period (six months).  As a result, the formal letter of intent satisfied the requirement of "objective facts, figures, or data from which the amount of lost profits can be ascertained."  *Holt,* 835 S.W.2d at 84.

Furthermore, several weeks later Moran repeated his statement of intent in the following letter to Marc Johnson:

Dear Marc:

---

[24]Federal concedes that Texas courts have permitted recovery of lost profits where there was "proof of existing, enforceable contracts."  Reply Brief for Federal at 4.

In reference to our July 30th, Letter of Intent for Eight Hundred (800) "Duravision Displays" we are confirming you that as per our conversations with Mr. Rodolfo Velasco we accepted that the price for each Display will be $3,500.00 USD FOB Mexico City and we will pay you the amount of $1,000.00 USD per display per year as a "License Fee" for using the exclusive rights to market this concept in Mexico.

By accepting these terms you will assure us that nobody will be able to purchase these Signs from you for the purpose of exporting them into Mexico....

SINCERELY YOURS.

/s/ALFONSO MORAN DIRECTOR.

Record on Appeal, Defendant's Exhibit D-141.

Moran's letters amply support the inference that STOC would have entered into a binding contract for the purchase of those displays had they been available.[25] Furthermore, there is no reason to believe that MPR would have been less willing than STOC to complete the sale of the 800 Duravision machines. Even assuming that the machines would have cost MPR $3100 each, as Federal contends, MPR would have made a profit on the sale of each machine, and therefore had good reason to sell the machines which STOC desired to purchase. In light of these facts, it is reasonably certain that a binding contract for the sale of 800 Duravision machines would have been completed, had they been produced.[26]

_____

[25]Moran testified at trial that in his experience in business, written agreements usually follow formal letters of intent. *See* Record on Appeal, vol. 26, at 93.

[26]Federal contends that the "number of displays that could have been sold if the displays had functioned properly is a matter of pure speculation" because Moran's "letters of intent were not supported by orders from" stores where the displays would eventually be installed. Reply Brief for Federal at 8. We disagree. Despite the absence of contracts to install units in the field, Moran issued the formal letter of intent and, several

25

Federal argues, however, that Moran's formal letter of intent is merely an unenforceable agreement to agree, and as such will not support recovery of lost profits damages. Federal relies for that proposition on *Reid v. El Paso Construction Co.,* 498 S.W.2d 923 (Tex.1973), where the Supreme Court of Texas reversed an award of lost profits which was based on an unexecuted collateral contract, holding that proof of the lost profits was "remote, contingent, and too uncertain." *Id.* at 925. However, in *Reid* the Texas Supreme Court did not hold that executory contracts generally are insufficient evidence of future lost profits. Furthermore, Reid is distinguishable on its facts.

The plaintiffs in *Reid* purchased land from the defendants and entered into an oral agreement with a third party to build apartment buildings on the premises. *See id.* The plaintiffs alleged that they lost profits, which they would have earned by building the apartments, because that the defendants had secretly altered the drainage of the land before selling it to the plaintiffs, causing it to flood with the first heavy rains. *Id.* at 924-25. In denying recovery of the lost profits, the Texas Supreme

---

weeks later, sought MPR's and Duravision's acceptance of its terms. *See supra,* Record on Appeal, Defendant's Exhibits D-140 (July 30 letter of intent), D-141 (letter of 20 August). That evidence showed with reasonable certainty that Moran would have entered into a contract to buy 800 units, even though he had not obtained contracts to install the units in public establishments. Admittedly, the absence of contracts for installation of the units might have compromised STOC's ability to honor an agreement to purchase 800 units from MPR. However, it is always possible that contracts will be breached, and Texas courts nonetheless have indicated that contracts which would have given rise to certain profits may satisfy the requirement of reasonable certainty.

Court noted that there was "no evidence that [the defendants] knew or had any reason to know about an agreement by which plaintiffs intended to or had a contract to erect apartment units on the vacant lot...." *Id.* at 925. Here, by contrast, Federal knew that Duravision would attempt to distribute hundreds of its machines for placement in public establishments. Therefore, *Reid* does not require reversal in this case.

Federal also relies on *Federal Land Bank Ass'n v. Sloane,* 793 S.W.2d 692 (Tex.App.—Tyler 1990), *rev'd in part on other grounds,* 825 S.W.2d 439 (Tex.1991), in which the court of appeals overturned a jury verdict awarding damages for lost profits. *See id.* at 699-700, 701. Hoping to raise broiler chickens for sale to Pilgrim's Pride, the Sloanes sought financing from FLBA for construction of two chicken houses. *See id.* at 694. FLBA's loan officer assured the Sloanes that their loan application had been approved, but several months later FLBA informed the Sloanes that the money would not be forthcoming. *See id.* at 694-95. As a result, the Sloanes were unable to finalize an agreement with Pilgrim's Pride. *See id.* at 695. The Sloanes sued FLBA, and the jury awarded damages for profits that the Sloanes would have made under a contract with Pilgrim's Pride. *See id.*

The court of appeals reversed the award of lost profits, stating that "there was no proposed form of contract between the Sloanes and Pilgrim introduced into evidence; [and] there was no proof as to any of the specific terms of such proposed future contract from which the jury could award lost profits with

27

reasonable certainty." *Id.* at 699. *Sloane* is easily distinguished from this case because Moran's formal letter of intent did propose a contract between STOC and MPR, including specific terms of price, quantity, and delivery date. Because it is distinguishable on its facts, *Sloane* is not controlling.[27]

I would therefore hold that Duravision and MPR proved with reasonable certainty that they would have sold 800 Duravision display machines to STOC, and that both MPR and Duravision are

---

[27]The court of appeals in *Sloane* also relied on dicta from the court of appeals' opinion in *Allied Bank West Loop v. C.B.D. & Associates,* 728 S.W.2d 49 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). The court in *Allied Bank* stated that "[i]n order to recover lost profits, a party must show either a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty." *Id.* at 54-55. However, the *Allied Bank* case did not raise the issue whether future contracts must actually be in existence to permit the recovery of lost profits where there is no profit history: the court sustained the award of lost profits because the plaintiff's "financial history ... showed profitability." *Id.* at 55. Furthermore, after carefully examining the two cases cited by *Allied Bank* for the requirement of existing future contracts—*Southwest Battery* and *Automark of Texas v. Discount Trophies,* 681 S.W.2d 828 (Tex.App.—Dallas 1984, no writ)—we can find no support for such a rigid rule. To the contrary, both *Southwest Battery* and *Automark* indicate that the recoverability of lost profits must be decided upon the facts of each case. *See Southwest Battery,* 115 S.W.2d at 1099 ("It is impossible to announce with exact certainty any rule measuring the profits the loss for which recovery may be had."); *Automark,* 681 S.W.2d at 829 ("Each such case must be determined on its own facts."); *see also Teletron,* 877 S.W.2d at 279 (stating that the "requirement of "reasonable certainty' in the proof of lost profits is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise," and that "[w]hat constitutes reasonably certain evidence of lost profits is a fact intensive determination"). Although we recognize the probative force of existing contracts in lost profits cases, *see Holt,* 835 S.W.2d at 85 ("The Heines could have supported their lost profits with testimony that they had lost out on *specific* contracts...."), we do not regard Texas law as including a strict requirement of the actual existence of future contracts wherever no history of profitability is shown.

28

entitled to collect license fees and profits from the sale of those machines.

ii

Federal further contends that the evidence does not support Moore's and Pflaum's assumption that Federal would have sold machines to MPR for $2500. In calculating MPR's and that Duravision's profits on the sale of displays to STOC, Moore and Pflaum posited that MPR could have purchased the machines from Federal for $2500 each and sold them to STOC for $3500 each, resulting in a per-machine sales profit of $1000. Duravision and MPR contend that Federal promised to reduce the cost of each display from $3100—the amount provided in the initial agreement between Duravision and Federal—to $2500. Federal argues that no agreement was reached for a reduction in the price of a Duravision display from $3100 to $2500, and that Duravision and MPR's experts merely speculated that the price of display machines would drop to $2500. Federal contends that any profits from the sale of display machines should thus be based on a cost to MPR of $3100, resulting in a profit of only $400 on the sale of each machine.

Pflaum, Duravision's expert, admitted that he had never seen a document which stated an agreed price per unit for the Duravision displays.[28] When asked whether he was "aware of how the twenty-five hundred dollar per machine cost came into effect," Pflaum answered: "There were some early discussions I've seen notes on...." MPR's

---

[28]*See* Record on Appeal, vol. 30, at 16 ("I've seen a lot of things about what the price is going to be. I can't say that any one of them says this is the price we agree on.").

29

expert, Moore, who also based his calculations on the price of $2500 per machine, agreed that he had "never seen a letter written from Federal sign in which they agree to keep the price at twenty-five hundred dollars."  Neither had Moore seen an invoice from Federal Sign bearing the price $2500 per machine.

Federal's district manager, Mike Harris, dealt extensively with Duravision and MPR regarding the price of Duravision displays. Harris testified that he had "had no way of knowing what the final purchase price would be," and that "the only representations that [Federal] ever made to [Duravision were] that [Federal] would try to have the machine priced in th[e] ballpark" of $2500.  Record on Appeal, vol. 34, at 216.  During his testimony Harris specifically denied "that [he] represented that the price would be twenty-five hundred dollars or less," *id.* at 218, and further testified as follows:  "We had discussions.  We may have said, it might be twenty-five hundred, maybe it will be twenty-five hundred, it could be twenty-five hundred.  We were still in the development process ... and there was no way for us to know what the price would be." *Id.*

Other evidence in the record tends to show that Harris may have promised a reduction in the price of the Duravision machines. However, that evidence merely raises questions about the amount of any possible price reduction.  Rodolfo Velasco, of MPR, testified as follows:

> Q What was your agreement with Federal Sign relative to how much each machine would cost if you bought in quantities?
>
> A Mike Harris told me that the price would be reduced.  From

the first machine that I paid thirty-five hundred dollars, that would be reduced around twenty-three to twenty-five hundred dollars ... if I purchased in volume.

*Id.* vol. 24, at 83. Velasco also indicated in a letter to Duravision that Harris had "offered a discount after the first twenty machines and the price that [was] quoted was around $2,350.00 to $2,400.00 USD per machine." *Id.* Defendant's Exhibit D-121. John Vickers, of Duravision, testified that he was once present when Velasco ordered two hundred signs, and "[t]he agreement was twenty-six hundred and sixty-five dollars for the first hundred and twenty-five hundred thereafter." *Id.* vol. 23, at 44.[29] Although this evidence supports the conclusion that a price reduction was agreed to by Federal, it does not show sufficiently what the amount of the reduced price would have been. Velasco does not identify a specific agreed price: he refers to two different *ranges* of prices—$2300 to $2500, and $2350 to $2400. Vickers testified that, of the 200 machines ordered, 100 would have cost $2650.

Furthermore, the evidence does not show sufficiently when any reduction in price would have occurred. In his letter to Duravision, *see supra,* Velasco indicates Harris promised a reduction after the first twenty machines. However, Velasco testified differently at trial:

Q And what type of volume did you have to purchase in order to get the price down to twenty-five hundred dollars per machine?

A He had it mentioned that he knew that we were talking

---

[29]Vickers testified that this agreement was reached between Rodolfo Velasco and Mike Harris.

about—to start eight hundred to twelve hundred units. *Id.* vol. 24, at 83-84. Although Vickers testified about an order for 200 machines, he did not say when this order was placed, or how many Duravision machines would have been sold already before these 200 machines. Therefore, the evidence does not show sufficiently whether a reduction in price would have been in effect when MPR purchased the 800 machines for resale to STOC.

As a result, I would reverse the damage awards for MPR and Duravision to the extent that they are based on a sale price to MPR of $2500 and a corresponding profit margin of $1000 per machine. The district court did not address whether Federal would have reduced the price of Duravision displays below the rate of $3100 each, which was provided for in the original Display Sales Agreement between Duravision and Federal.[30] Because the district court instead accepted the experts' assumption that Federal would have reduced its price to $2500, I would not on our own initiative make that determination. Duravision and MPR did, however, prove that *some* profits had been lost, and I would therefore remand for a determination of what both the price of the displays and the corresponding lost profits would have been.

### iii

We also find insufficient evidence to prove with reasonable certainty that STOC would have paid license fees for each of the

---

[30]It is also speculative whether MPR could have continued to purchase the machines for $3100, since the contract with Federal only bound Federal to provide 20 machines at that price. However, Federal does not make that argument. It is therefore waived.

32

800 machines in 1990 and 1991.[31] Both Moore and Pflaum calculated lost profits based on license fees of $1000 per machine for 1990 and for 1991. However, as Federal points out, there is no objective evidence to prove that STOC would have continued to pay the license fees during those years. MPR and Duravision do not cite, and we have not found, any evidence that STOC held contracts for the sale of advertising on the machines it intended to purchase from MPR. Therefore, there are no objective facts and figures to show that STOC could have done enough business during 1990 and 1991 to be able to pay $800,000 per year in license fees. Furthermore, STOC was not contractually obligated to continue paying license fees for three years. Although the agreement between STOC and MPR stated that the amount of the license fees would be negotiated after three years, it did not identify three years as the term of the agreement. Therefore STOC was not bound by any agreement for a term of three years. *See City of Big Spring v. Bd. of Control,* 404 S.W.2d 810, 817 (Tex.1966) (stating that "when a contract has no definite and determinable term ... it may be terminated at the end of a reasonable time in order to carry out the intention of the parties"). Absent a binding agreement or other objective data to show that STOC would have paid the license fees beyond the first year, there is insufficient evidence to prove with reasonable certainty that MPR and Duravision would have shared $800,000 in license fees during 1990 and during 1991. The award of lost

---

[31]Federal does not argue that the license fees would not have been paid during the first year—1989.

profits from STOC's license fees must therefore be vacated, and I would hold that Duravision and MPR may recover lost profits only from license fee revenues that the jury found they would have received prior to 1990: $300,000 for Duravision, and $400,000 for MPR.

iv

In summary, I would hold that the evidence shows with reasonable certainty that 800 Duravision displays would have been sold to STOC in Mexico. As a result, the total profit on sales of displays to STOC from which lost profits could be recovered should on remand be calculated as follows: ($3500-price determined on remand) × 800 machines, and Duravision and MPR are each entitled to recover lost profits from half of that sum.

I would also hold that Duravision may recover lost profits from license fees of only $300,000—the amount which Pflaum calculated Duravision would have received before 1990, and that MPR also may recover lost profits only from license fees it would have received prior to 1990. Furthermore, to the extent that the lost license fees awarded to MPR are based on the sale to STOC of 1200 Duravision displays, those lost license fees were not proved with reasonable certainty. It was only shown with reasonable certainty that 800 machines would have been sold to STOC. Consequently, rather than the $1,800,000 which the jury awarded, I would hold that MPR may recover lost profits from license fee revenues of only

$400,000.[32]

Also, I would not disturb the award of lost profits based on one-half of the $175,000 franchise fee paid by STOC to MPR—$87,500 to each of Duravision and MPR.[33]

c

Gran Bazar

Accepting the calculations promulgated by Duravision's and MPR's experts, the jury also awarded damages to both companies for profits which would have been earned as a result of a leasing agreement with Gran Bazar, a major retailer in Mexico City. The experts' calculations were based on the following scenario.

Gran Bazar would lease thirty Duravision displays, all

---

[32]I recognize that this award varies from the amount which would be recovered by Duravision. For reasons already discussed, see supra notes 18, 20, Pflaum computed a different damage amount for lost license fees than did Moore. However, because that aspect of the damage award for Duravision is not challenged on appeal, the issue is not before this Court.

[33]Federal argues that the $175,000 franchise fee paid by STOC to MPR cannot give rise to damages because it was a collateral agreement unanticipated by Federal. For this proposition Federal cites only to a segment of Rodolfo Velasco's testimony where he states that Duravision and Federal, in entering into the Display Sales Agreement, did not anticipate the installation of Duravision machines in Mexico. See Record on Appeal, vol. 27, at 127. However, Velasco's testimony does not prove Federal failed to foresee that Duravision might earn revenues such as franchise fees. It suggests only that Federal did not anticipate the distribution of Duravision machines in Mexico. Other evidence supports the conclusion that Federal was aware of Duravision's and MPR's plans for marketing the Duravision displays. During meetings with Marc Johnson, prior to the execution of the agreement between Federal and Duravision, Mike Harris of Federal learned that Duravision might try to sell or lease its machines in Oklahoma and Texas, and that they "were talking about a good number of machines." Federal's argument that the franchise fee was unanticipated is without merit.

35

belonging to STOC, and place fifteen of the units in each of two Gran Bazar stores. Lease payments would be $80,000 per year per machine, such that the total as to all thirty machines would be $2,400,000 per year. Lease payments would be received initially by STOC, which would then remit one half—$1,200,000 annually—to MPR; and MPR would pay to Duravision one half of that—$600,000. Therefore the lease revenues for a given year were ultimately divided as follows: $1,200,000 to STOC; and $600,000 each to Duravision and MPR.[34]

Moore calculated MPR's lost profits based on lease payments for 1989, 1990, and 1991, resulting in a total for MPR of $1,800,000. Like Moore, Pflaum calculated Duravision's lost profits from leases to Gran Bazar for 1989, 1990 and 1991, totaling $1,800,000. However, Pflaum also calculated lost profits for the last quarter of 1988, in the amount of $150,000 (1/4 × $600,000 = $150,000), so that Duravision's total damage estimate for profits from leasing fees was $1,950,000. The jury awarded MPR and Duravision damages in accordance with those figures.

Federal first argues the evidence did not show with reasonable certainty that Gran Bazar would lease thirty Duravision machines to

---

[34]It is undisputed that STOC and MPR agreed to share equally any profits STOC received by leasing Duravision signs to Gran Bazar. *See id.* vol. 25, at 134 (where Alfonso Moran, director of STOC, testified that STOC was "going to split fifty/fifty as part of joint venture some profits with M.P.R. Group"); *id.* vol. 26, at 84 (where Moran testified that "STOC and MPR ... had an agreement to split, one half, fifty-fifty ... all monies"); *see also id.* at 119. It is also undisputed that MPR agreed to share equally with Duravision any profits it made by marketing the Duravision concept in Mexico. *See id.* Defendant's Exhibit D-124.

Gran Bazar. At the time of the agreement between STOC and Gran Bazar there was one Gran Bazar store in operation in Mexico City, and the grand opening of another store was planned. Federal contends that the lease of thirty Duravision units for these stores was a mere "contingency" which was not proven with reasonable certainty. We disagree.

Several witnesses, including Marco Antonio Luna, the sub-director of Gran Bazar, and Alfonso Moran, the director of STOC, testified that Gran Bazar leased fifteen Duravision machines for the first Gran Bazar store. Luna also testified that twenty Duravision machines "were going to be installed in the Gran Bazar store, the second one," and that these machines were "on the same agreement" as the machines for the first store. Record on Appeal, vol. 25, at 49-50. Rodolfo Velasco testified that the same agreement was reached for the second Gran Bazar store as for the first—providing for fifteen machines. *See id.* vol. 23, at 198. A letter from MPR to Federal also refers to a "contract" with "the second Gran Bazar" for "15 more machines and another $1.2 million." The letter says that "we"—apparently referring to MPR and STOC—"were going to be paid $2,000.00 USD per ad per year in each machine for 15 machines." *Id.* Defendant's Exhibit D-185. This evidence would permit a reasonable juror to conclude that Gran Bazar and STOC had a contract for the lease of at least thirty Duravision signs.[35] I would therefore hold that the evidence of

---

[35]Luna's testimony that twenty displays would have been placed in the second Gran Bazar suggests that 35 signs in all would have been leased.

those contracts proved with reasonable certainty that thirty signs would have been leased to Gran Bazar by STOC. *See Holt,* 835 S.W.2d at 85; *Barbouti v. Munden,* 866 S.W.2d 288, 297 (Tex.App.—Houston [14th Dist.] 1993, writ denied) ("One party's testimony of estimated profits, *without proof of the existence of an actual contract* or any objective data, is not sufficient in our opinion to support an award of lost profits." (emphasis added)); *Fleming Mfg. Co.,* 734 S.W.2d at 407; *Davis v. Small Business Inv. Co.,* 535 S.W.2d 740, 743 (Tex.Civ.App.—Texarkana 1976, writ ref'd n.r.e.) (upholding denial of lost profits damages where, *inter alia,* "[t]here was no evidence of contracts or sales which could have been anticipated").

Federal also contends, however, that the evidence did not show with reasonable certainty that Gran Bazar would pay $80,000 per machine to lease the Duravision units. Federal argues that a letter from Marco Antonio Luna, sub-director of Gran Bazar, indicates $80,000 was to be paid for *all fifteen* units which were to be leased for the first Gran Bazar location. *See* Record on Appeal, Defendant's Exhibit D-138. Federal's argument is without merit.

Luna admitted at trial that the letter in question, which is written in Spanish, did not explicitly say $80,000 was to be paid for each machine. *See id.* vol. 25, at 79, 81. As Luna testified, the letter refers only to a lease of fifteen machines for $80,000. However, the letter does not purport to be a contract between STOC and Gran Bazar. It merely states that "Gran Bazar is *interested* in

38

market[ing] the ads in ... Duravision displays" under a leasing agreement. *Id.* Defendant's Exhibit D-138 (emphasis added). Furthermore, Luna repeatedly testified that the oral agreement between STOC and Gran Bazar obligated Gran Bazar to pay the sum of $80,000 annually for each machine, *see id.* vol. 25, at 24-25, 29, 79. Alfonso Moran, the director of STOC, testified to the same effect. *See id.* vol. 26, at 81. Their testimony was sufficient to prove that an agreement between Gran Bazar and STOC required Gran Bazar to pay $80,000 per machine per year. Because of the existence of that contract, I would hold that the evidence showed with reasonable certainty that STOC would have received $80,000 per year for each machine it leased to Gran Bazar. *See Holt,* 835 S.W.2d at 85; *Barbouti,* 866 S.W.2d at 297; *Fleming Mfg. Co.,* 734 S.W.2d at 407; *Davis,* 535 S.W.2d at 743.

Finally, Federal argues that the evidence failed to show with reasonable certainty that any signs would have been leased by Gran Bazar during 1990 and 1991—the second and third years as to which damages were awarded for lost lease revenues. Federal contends that "no objective facts and data in the record supported that speculation." We agree. We have not found, and MPR and Duravision do not cite, any evidence in the record which indicates that the Gran Bazar lease agreement extended for a period greater than one year. Alfonso Moran, the director of STOC, testified that the Gran Bazar agreement was "for an indefinite period of time." Record on Appeal, vol. 26, at 32. Furthermore Rodolfo Velasco, writing to Federal on behalf of MPR, indicated that the "contract with Gran

Bazar was signed for $1.2 million Dollars (15 machines at $80,000 USD per year)." *Id.* Defendant's Exhibit D-185. Velasco also referred to the agreement regarding the second Gran Bazar location as a "contract ... for 15 more machines and another $1.2 million." *Id.* Velasco's letter does not indicate that he regarded the Gran Bazar contracts as having a term of three years. To the contrary, the letter suggests that Velasco considered the Gran Bazar contracts to be worth only $1.2 million each, which was the agreed rental payment for one year. On direct examination Pflaum, Duravision's expert, was asked why his calculations of Duravision's damages extended over a period of three years, and he responded: "In reviewing, looking at the projections, this looked like it was going to be a very profitable business. And, clearly, a very profitable business." *Id.* vol. 38, at 33.[36] The most we have found to support the projection of lease revenues into a second and third year is Moran's testimony that he was "in this deal for the long term." *Id.* vol. 26, at 37. Moran's statement of a general desire to continue participating in what was, in his words, a "terrific

---

[36]Pflaum also answered "yes" to the following question: "With respect to the Gran Bazar line, you *contend,* as I understand it, that the agreement was that Gran Bazar would pay eighty-thousand dollars, per machine, per year, for three years, to lease the machines, to STOC." Record on Appeal, vol. 30, at 19 (emphasis added). Pflaum's testimony does not reflect any facts of the STOC-Gran Bazar agreement which would support his "contention." Pflaum, an expert in finance, testified about the economic consequences of the transactions in question here. He did not testify from personal knowledge about the facts of the transactions which took place. *See id.* at 23 (where Pflaum testified that his understanding of the Gran Bazar transaction was "based on reading the depositions and talking to Mr. Velasco").

business," reveals neither an agreement between STOC and Gran Bazar to lease the Duravision machines for more than one year, nor any other facts, figures, or data sufficient to prove with reasonable certainty that profits would have been earned from the Gran Bazar deal for a period of three years.

Because we agree with Federal's third argument, I would hold that MPR and Duravision may recover lost profits from the Gran Bazar lease agreement only for revenues which would have been received during the first year of that agreement—$600,000 in lease revenues for each of Duravision and MPR. Accordingly, I would reverse the jury's verdict awarding lost profits based on an additional $1,200,000 to MPR and an additional $1,350,000 to Duravision on the grounds that it was not proved with reasonable certainty that the Gran Bazar lease agreement would have remained in effect for more than one year.

d

South America

Duravision and MPR's experts also calculated, and the jury found, damages resulting from the loss of a sale of 300 Duravision machines to Ricardo Guerra, for distribution in South America. The jury found that Duravision lost $639,845, and MPR lost $525,000, consisting of profits on sales of Duravision machines, as well as license and franchise fees which would have been paid by Guerra. Federal argues that the amount of Duravision's and MPR's lost profits from license fees, and from sales of Duravision machines to Guerra, was not proved with reasonable certainty. We agree.

In a written contract, Guerra purchased from MPR the right to market, sell, and use the Duravision display in South America, Central America, and the Caribbean, except for Panama and Columbia. *See* Record on Appeal, Defendant's Exhibit D-134. In return for those rights Guerra agreed to pay MPR $225,000, of which he paid $22,500 upon the signing of the contract. MPR agreed to supply Guerra with Duravision signs "enough for [his] demand" at the price of $3500 per machine, and Guerra agreed to pay MPR an annual license fee for each machine purchased.[37]

Both Pflaum and Moore calculated lost profits based on the sale to Guerra of 300 Duravision machines, and the jury apparently credited the experts' calculations. We find the evidence insufficient to prove with reasonable certainty that 300 machines would have been sold to Guerra. The contract between Guerra and MPR does not require Guerra to purchase any particular number of Duravision machines. *See id.* In a letter to Guerra on behalf of MPR, Rodolfo Velasco wrote: "We accept your proposal to not establish a minimum quantity of purchase per year of these devices since the market potential existing in Central and South America has not yet been determined." *Id.* Intervenor's Exhibit I-155. Therefore, the record contains no evidence of a contract for the sale and purchase of 300 Duravision machines or any other number of machines.

---

[37]Because we reverse the award of license fees based on the lack of evidence to prove with reasonable certainty that any number of machines would have been sold, we do not reach the issue of the amount of the license fee that Guerra agreed to pay.

Furthermore, the other evidence upon which MPR and Duravision rely to show that 300 machines would have been purchased is too conjectural to satisfy the requirement of reasonable certainty. MPR and Duravision place considerable weight on a letter from Alejandro Amescua to MPR, in which Amescua states that he has "started talks with [Sr.] Ricardo Guerra ... about the possibility of acquiring the rights to commercialize the concept Duravision in all the countries of South America...." *Id.* Defendant's Exhibit D-132. After mentioning Guerra's "contacts," Amescua states that "[t]he person contacted and is functioning [sic] in important chains of supermarkets in South America, mentions at the minimum of 150 stores where [displays] could be located and at the minimum of 2 units per each store, which represent the sale of 300-400 units the first year." This letter is insufficient to prove with reasonable certainty that 300 Duravision display units would have been sold to Guerra. It merely refers to an unnamed person who "mentions" 150 stores where displays "could be located," and that evidence does not provide the facts and figures which would permit a trier of fact to determine with reasonable certainty that 300 units actually would have been sold. *See Automark of Texas v. Discount Trophies,* 681 S.W.2d 828, 830 (Tex.App.—Dallas 1984, no writ) (observing that Texas courts which have permitted recovery of lost profits have relied on "objective facts, figures, and data and not upon the subjective opinions of interested parties" (citing *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983)).

43

Nor is Duravision's and MPR's burden satisfied by the following testimony from Rodolfo Velasco: "Q: How many signs did Ricardo Guerra order from M.P.R. Group? A: He wanted to install three hundred signs...." Record on Appeal, vol. 24, at 25. The fact that Guerra "wanted" to install three hundred Duravision signs in South America falls short of proving that he would have purchased those signs, or even that he intended to purchase them under the terms of his agreement with MPR. Velasco's letter to Guerra reflects that Guerra was unwilling to agree to purchase any minimum number of Duravision displays, because the potential of the South American and Central American markets was undetermined. *See id.* Invervenor's Exhibit I-155. The fact that Guerra wanted to distribute 300 machines in South America therefore does not prove with reasonable certainty that he actually would have purchased them.

Nor is Duravision's and MPR's burden satisfied by a few handwritten notes which were admitted into evidence. *See id.* Defendant's Exhibit D-131. These notes include the following language: "Mr. Guerra 1. Has an agmt w/ 180 store chain in Col. Arg & Ven 2. Install 3-5 machines in ea." We understand this note to say that Guerra had an agreement with a chain of 180 retail stores in Colombia, Argentina, and Venezuela to place 3-5 machines in each store. However, as Federal points out, Guerra did not have the right to market Duravision displays in Colombia, *see id.* Defendant's Exhibit D-134 (Guerra's contract with MPR), and the note indicates that some of the stores were located in Colombia.

44

Because the note does not indicate how many of the stores involved in the "agreement" were located in countries where Guerra was entitled to market Duravision displays, it does not prove with reasonable certainty that Guerra would have bought any particular number of Duravision displays under his agreement with MPR. Therefore the amount of damages was not proved with reasonable certainty.[38]

Because the evidence does not show that any particular number of Duravision signs would have been sold to Ricardo Guerra for distribution in South America, the evidence fails to prove with reasonable certainty any amount of lost profits based on sale to Guerra of Duravision units. MPR and Duravision therefore may not recover profits which allegedly would have been earned on the sale of Duravision signs.[39] Nor may Duravision or MPR recover license fees which allegedly would have been paid annually for each Duravision machine sold.

However, I would hold that MPR and Duravision may each recover

---

[38]MPR and Duravision contend that "Guerra was going to put the machines in Venezuela, not in Columbia as suggested by Federal." However, the portions of the record which Duravision and MPR cite provide no support for that assertion. *See* Record on Appeal, vol. 23, at 169-70, 179-80.

[39]Moore and Pflaum calculated—and the jury awarded—$1000 in sale profits for each of 300 Duravision machines to be sold to Guerra. The sum of $1000 profit on the sale of each machine was based on an anticipated reduction in the price charged by Federal for the machines—from $3100 to $2500. We have already held that such a reduction in the price of the machines was not proved with reasonable certainty. *See supra* part II.A.2.b.ii. However, because we reverse the jury's award of sales profits on other grounds, the lack of evidence to prove the anticipated reduction in price does not present a basis for relief.

lost profits based on one-half of the $225,000 franchise fee which Guerra agreed to pay for the right to market Duravision machines in South America.[40]  Guerra agreed to buy the exclusive right to market the Duravision concept in South America for $225,000, and his obligation to do so was not contingent upon his use of the rights purchased.  The written agreement for Guerra to pay the franchise fee proved with reasonable certainty that Duravision and MPR each would have received half of that sum—$112,500.  *See Holt,* 835 S.W.2d at 85;  *Barbouti,* 866 S.W.2d at 297;  *Fleming Mfg. Co.,* 734 S.W.2d at 407;  *Davis,* 535 S.W.2d at 743.  To the extent of lost profits based on that amount, I would therefore hold that the jury's verdict is supported by the evidence.

e

Arkansas

Duravision granted a franchise to an Arkansas company called Duravision of America, Inc. ("the Arkansas franchisee"), which set out to place Duravision machines in public establishments and sell advertising on the machines.  It is undisputed that the Arkansas franchisee agreed to purchase twenty-one display units from Duravision, and that the Arkansas franchisee agreed to pay Duravision a six percent royalty on any revenues it earned by selling advertising.  Pflaum calculated—and the jury awarded to Duravision—damages for lost profits based on (1) lost sales of twenty-one Duravision units to the Arkansas franchisee;  and (2)

---

[40]It is undisputed that MPR was to remit to Duravision one-half of the $225,000 franchise fee to be paid by Guerra.

royalties which would have been paid to Duravision by the Arkansas franchisee.

Based on a per unit profit of $1000, the jury awarded Duravision $21,000 for profits lost on sales of Duravision units to the Arkansas franchisee.  Federal does not argue that the evidence fails to prove these lost profits with reasonable certainty.[41]  However, Federal does challenge Pflaum's calculations, and the jury's award, of profits that Duravision would have earned by way of its six percent royalty on the Arkansas franchisee's sales of advertising.  We agree that these royalty-based profits were not proved with reasonable certainty.

Pflaum testified that between the last quarter of 1988 and the end of 1991, Duravision would have earned royalties totalling $81,367.  Based on the twenty-one Duravision displays which were to be installed by the Arkansas franchisee, Pflaum calculated royalties during the fourth quarter of 1988 and all four quarters of 1989, and during the years 1990 and 1991.  Pflaum figured that the numbers of ads being shown in each display would increase quarter-by-quarter and year-by-year:  on average each Duravision display would contain only twenty ads during the last quarter of 1988, but by 1991 each Duravision display would be showing

---

[41]Whereas profits on the sale of Duravision displays to STOC were awarded based on an anticipated reduction in Federal's per-unit price for displays, *see supra* part II.A.2.b.ii., the profit margin of $1000 on units sold to the Arkansas franchisee was based on a provision in the franchise agreement that Duravision would "make the sign available to Franchisee at ... cost plus $1,000.00 per sign."  Record on Appeal, Plaintiff's Exhibit P-48.

47

thirty-six ads.  Pflaum also figured that the annual revenue earned on each ad would increase from $500 in 1988, to $566 in 1989, to $669 in 1990, and $735 in 1991.

We conclude that these calculations, and the damage award based thereon, were not supported by the facts, figures, and objective data required to prove lost profits with reasonable certainty.  We have not found in the record, and Duravision and MPR do not cite, any objective facts to support Pflaum's prediction that the Arkansas franchisee would have sold twenty ads per machine in 1988, much less thirty-six ads per machine in 1991.  Only four contracts for the sale of advertising were actually obtained by the Arkansas franchisee, one of which encompassed the sale of two ads.  When asked whether his "assumption of number of ads per sign" was "based on written contracts," Pflaum responded in the negative: "[T]hat's purely an assumption on my part based on reading Mr. Bilgisher's Deposition[42] and knowing that the people who were running that franchise were experienced businessmen, spent a hundred thousand dollars of their own money trying to get that business going.  They were serious people."  Second Supplementary Record on Appeal at 141.  That is insufficient objective evidence to prove with reasonable certainty that the Arkansas franchisee would have sold ads in the numbers forecast by Pflaum.

However, as we mentioned, four contracts were actually obtained by the Arkansas franchisee for the sale of ads, and I

_____

[42]The parties do not cite to the Bilgisher deposition, and it is not included in the record on appeal.

48

would hold that those contracts prove with reasonable certainty that Duravision would have earned a royalty of six percent on the sales embodied in those four agreements. *See Holt,* 835 S.W.2d at 85; *Barbouti,* 866 S.W.2d at 297; *Fleming Mfg. Co.,* 734 S.W.2d at 407; *Davis,* 535 S.W.2d at 743. The total revenue from those sales was $5,395.00 ($999.00 + $1099.00 + $2098.00 = $5395.00), and six percent of that sum is $323.70. I would affirm the jury's award of lost profits based on royalties in that amount, as well as the award of damages based on $21,000 in profits from the sale of Duravision units to the Arkansas franchise—which is not challenged by Federal. As a result, I would hold that MPR and Duravision may recover lost profits based on revenues from Arkansas in the amount of $21,323.70.[43]

---

[43]We must briefly address an argument, pressed strenuously by Federal at oral argument, which relates to all of the damages awarded by the jury for lost profits. In the Texas Supreme Court's recent decision in *Teletron,* that court held that lost profits were not proven with reasonable certainty, and placed considerable weight on the fact that the transactions at issue "involve[d] the proposed sale of a new and unique product which had never been sold before." *Teletron,* 877 S.W.2d at 280. The court pointed out that "there [was] no evidence that a thermostat like the T-2000 has ever been produced and sold by anyone," and distinguished its prior cases permitting an award of lost profits—*Pace* and *Southwest Battery*—on that basis. *See id.* Federal contends that the same result must be reached here, because the Duravision display machine—which was supposed to accommodate 40 advertising frames at once, rather than only 25 or 30—was a unique product which was never successfully produced. Although we recognize that a properly working Duravision machine was never successfully manufactured by Federal, the record does not reflect that the machine envisioned by the parties was so unique that *Teletron* requires a wholesale denial of any lost profits. It is undisputed that Marc Johnson got the idea for the Duravision machine from his experience with similar machines that he observed while working for Rollavision in California. Furthermore, the record contains evidence of several other companies, both in this country and abroad, which marketed a

To summarize part II.A.2, I would hold that the following revenues on behalf of Duravision were proved with reasonable certainty:

(i)   lost profits from the sale of Duravision machines to STOC, equal to ($3500—price to be determined on remand) × 800

---

working machine similar to the Duravision display.  The major difference between the other machines and the Duravision machine is its capacity to accommodate forty advertising frames rather than twenty or thirty.  We do not conclude, based on that difference, that the Duravision machine was a totally unique product or that "there was no comparable device on the market." *Id.* at 277.  Instead this is a case where a manufacturer attempted, unsuccessfully, to improve on a type of machine which had been manufactured by others.

We also find unpersuasive Federal's argument that the award of lost profits damages must be reversed altogether because the individuals involved in MPR and Duravision had little experience with video display machines.  The experience of the individuals involved is clearly an important factor in determining whether lost profits may be recovered.  *See id.* at 280 ("The focus is on the experience of the persons involved in the enterprise and the nature of the business activity, and the relevant market.").  Furthermore, Marc Johnson had only a few months' experience with Rollavision, U.S.A., Inc., and Rodolfo Velasco apparently had no prior experience with devices of this kind.  However, under the facts of this case the individual participants' lack of experience with a particular type of machine is not fatal to their claim for lost profits.  Whatever their prior experience, they were able to acquire a number of binding contracts and other arrangements which showed with reasonable certainty that certain profits would have been earned if not for Federal's misconduct.  The individuals' lack of experience with video advertising therefore is not determinative.

We also reject MPR's argument that the jury's damages award must be sustained in its entirety because MPR suffered harm to its credit reputation.  The jury did not award damages for that type of harm:  it accepted Moore's calculations, which did not include an amount for damage to MPR's credit reputation.  Because MPR has not appealed the jury's verdict, the issue of damages for MPR's alleged loss of credit reputation is not properly before the Court.

50

machines;

(ii)  $300,000 in license fees to be paid by STOC to MPR;

(iii) $87,500 from fee paid by STOC to MPR for the exclusive right to market the Duravision concept in Mexico;

(iv) $600,000 in lease revenues from Gran Bazar in Mexico City;

(v)  $112,500 from Guerra's franchise fee for the right to market the Duravision concept in South America;  and

(vi) $21,323.70 from the Arkansas franchisee.

I would also hold that the following lost revenues on behalf of MPR were shown with reasonable certainty:

(i)  lost profits from the sale of Duravision machines to STOC, equal to ($3500—price to be determined on remand) × 800 machines;

(ii)  $400,000 in license fees to be paid by STOC to MPR;

(iii) $87,500 from fee paid by STOC to MPR for the exclusive right to market the Duravision concept in Mexico;

(iv) $600,000 in lease revenues from Gran Bazar in Mexico City; and

(v)  $112,500 from Guerra's franchise fee for the right to market the Duravision concept in South America.

Because the jury awarded damages for lost profits from revenues in excess of those amounts, I would vacate the judgment entered upon that verdict, and remand only for a determination of the price that Federal would have sold at and the amount of lost profits based on that price.  For reasons explained *infra* at part II.B, Federal is also entitled to a new trial on the issue of the distribution of lost profits which would have been earned from the distribution of Duravision machines outside the United States and Canada.  *See infra* part II.B.  Accordingly, I would hold that on remand, Duravision and MPR may recover only lost profits based on

51

revenues which, in my opinion, I would find were proved with reasonable certainty.[44]

3

Federal also argues that the statute of frauds, Tex.Bus. & Com.Code Ann. § 2.201(a) (Vernon 1968), bars Duravision's and MPR's recovery of lost profits for sales of signs not agreed to in writing. Section 2.201(a) provides:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

Federal contends that "[t]he only agreement in writing obligates Federal to supply only 20 displays," and "[t]herefore, even assuming Duravision and MPR proved lost profits with the requisite proof, they would be limited to recovering profits lost only from these 20 displays." We disagree.

The statute of frauds does not bar recovery on a claim of fraud or misrepresentation which sounds in tort. *See Sloane,* 825 S.W.2d at 442 (holding that statute of frauds did not bar recovery where plaintiff alleged negligent misrepresentation, not breach of contract); *Sibley v. Southland Life Ins. Co.,* 36 S.W.2d 145, 146 (Tex.1931) (holding that because the plaintiff's "cause of action

---

[44]Because Texas law permits the recovery of lost profits, and not lost revenues, *see Holt,* 835 S.W.2d at 83 n. 1, on remand MPR's and Duravision's expenses, as well as their revenues, must be determined. *See infra* part II.B.

52

... [was] grounded in tort and not in contract ... [r]esponsibility for the tort committed [was] not affected by the fact that the false promise was made orally"); *Turner v. PV Int'l Corp.,* 765 S.W.2d 455, 461 (Tex.App.—Dallas 1988) ("The statute of frauds is not a defense to any action for damages based on fraud or breach of fiduciary duty, both being tort actions." (citing *Sibley* )), *writ denied per curiam,* 778 S.W.2d 865 (Tex.1989); *Inman v. Wallace,* 558 S.W.2d 554, 556 (Tex.Civ.App.—Waco 1977, no writ) (" "The fact that false representations are made in connection with a contract which the general statute of frauds requires to be in writing does not render it necessary that such representations shall be in writing in order that they may sustain an action of deceit ... where plaintiff does not seek to enforce the contract or sue for a breach thereof.' " (citation omitted)).[45]

Whether a particular claim sounds in tort or contract is not simply a matter of the legal theory pleaded. "[O]ften it is difficult in practice to determine the type of action that is brought. We must look to the substance of the cause of action and not necessarily the manner in which it was pleaded." *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 617-18 (Tex.1986); *see also Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494 (Tex.1991) (agreeing that negligence claim "sounded only in contract" because plaintiff "sought damages for breach of a duty

---

[45]*Krupp Organization v. Belin Communities, Inc.,* 582 S.W.2d 514 (Tex.Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.), upon which Federal relies, is a breach of contract case, *see id.* at 516, and is therefore distinguishable.

created under the contract"); *Barbouti,* 866 S.W.2d 288 (stating that although plaintiff "alleged ... fraud and conspiracy to commit fraud," defendants' "liability, if any, ar[ose] from failure to comply with the ... agreement; therefore the claim sound[ed] only in contract"); *Collins v. McCombs,* 511 S.W.2d 745, 747 (Tex.Civ.App.—San Antonio 1974, writ ref'd n.r.e.) ("Even if it be conceded that an action in tort for deceit is unaffected by the provisions of the statute of frauds, the judicial disregard of the statute should be limited to situations in which the essence of the action truly sounds in tort.").

Whether a particular claim sounds in tort depends in part on the duty alleged to have been violated:

> If the defendant's conduct ... would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. Conversely, if the defendant's conduct ... would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract.

*DeLanney,* 809 S.W.2d at 494; *see also Lawson v. Commercial Credit Business Loans,* 690 S.W.2d 679, 681 (Tex.App.—Waco 1985, writ ref'd n.r.e.) (holding that § 2.201 did "not insulate [the defendant] from liability under the Deceptive Trade Practices Act for the false and misleading statements which its employees made...." because the evidence raised an issue whether the defendant "did more than merely fail to perform under an oral agreement"); *Keriotis v. Lombardo Rental Trust,* 607 S.W.2d 44, 46 (Tex.Civ.App.—Beaumont 1980, writ ref'd n.r.e.) (holding that DTPA action for misrepresentations failed "under the statute of frauds" because "no attempt [was] made to establish any acts other than the

54

promise to convey and the failure to do so").

"[I]t is also instructive to examine the nature of the plaintiff's loss.  When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract."  *DeLanney,* 809 S.W.2d at 494;  *see also Keriotis,* 607 S.W.2d at 46 (stating that "both the alleged misrepresentations and the damages sought support the conclusion that plaintiff is attempting to recover damages for failure to perform an oral promise governed by the statute of frauds");  *Collins,* 511 S.W.2d at 747 ("Where plaintiff, although casting his complaint in the form of a cause of action for fraud, is attempting to recover damages for the breach of the promise, it is clear that he is, in effect, attempting to enforce the oral agreement.").  " "The nature of the injury most often determines which duty or duties are breached.  When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone.' " *DeLanney,* 809 S.W.2d at 494 (quoting *Jim Walter Homes,* 711 S.W.2d at 618).

Under the foregoing Texas authorities, Duravision's and MPR's fraud and DTPA claims sound in tort:  this is not a case where the defendant's misconduct amounts to little more than breach of a contract.  In addition to alleging that Federal failed to perform as it had promised, Duravision and MPR alleged and proved that Federal made numerous misrepresentations of the impending production and delivery of Duravision displays which were not provided for by agreements between Federal and either Duravision or

55

MPR.  Although the parties disagree as to how many display machines Federal was contractually bound to manufacture, neither of them contends that all of the hundreds of machines as to which the jury found misrepresentations were provided for by an agreement between the parties.[46]  Nor does the record support the conclusion that any agreement encompassed that many machines.  Furthermore, this is not a case where "the only loss or damage is to the subject matter of the contract," *DeLanney,* 809 S.W.2d at 494, since the jury awarded damages based on lost profits from numerous Duravision signs which were not provided for by any agreement between Federal and Duravision or MPR.[47]  The damages awarded by the jury in this case therefore were not merely damages for breach of a contract.  Because Duravision's and MPR's claims sound in tort rather than contract, recovery on those claims is not defeated by the statute of frauds.

B

Federal also contends that the magistrate judge committed reversible error by excluding from evidence Plaintiff's Exhibits 51 and 51a.  "Determinations of admissibility of evidence rest largely within the discretion of the trial court." *United States v. Gorel,*

---

[46]Federal contends that it only agreed to produce the 20 machines provided for in the original agreement with Duravision.  Duravision and MPR argue that the addendum to that contract increased Federal's obligation to 100 machines every 12 months.

[47]In almost every instance where we found that Duravision and MPR proved their lost profits with reasonable certainty, we so found because the display machines in question were the subject of binding contracts.  *See supra* part II.A.2.  However, the contracts to which we refer were not contracts between the parties to this lawsuit.

622 F.2d 100, 105 (5th Cir.1979), *cert. denied,* 445 U.S. 943, 100 S.Ct. 1340, 63 L.Ed.2d 777 (1980). "The trial judge has wide discretion as to relevance and materiality of evidence. Such rulings will not be disturbed on appeal absent a clear showing of an abuse of discretion." *United States v. Grimm,* 568 F.2d 1136, 1138 (5th Cir.1978). Nevertheless, we conclude that Federal's argument has merit.

Exhibit 51 is a written contract between Federal, Duravision, and MPR wherein Duravision assigned to MPR the exclusive right to purchase Duravision displays from Federal for distribution everywhere in the world except the United States and Canada "[i]n exchange for a four percent (4%) royalty on the gross amount [MPR] receives as license fees." Exhibit 51-A is an agreement, signed by Marc Johnson and Rodolfo Velasco, which provides that

> any net proceeds whatsoever received from MPR Group, Inc.'s efforts in obtaining users of the Duravision Concept in the world except for the United States of America and Canada shall be owned and distributed fifty percent (50%) to Marc E. Johnson, after the payment to Duravision Incorporated of a four percent (4%) royalty on all gross amounts received from license fees.

At trial counsel for Federal offered these exhibits into evidence, and the magistrate instructed counsel that he could go into Exhibit 51 if he could "establish that was a valid, binding contract." Counsel then elicited from John Vickers, a representative of Duravision, an admission that nothing on the face of Exhibit 51 or Exhibit 51-A indicated it was not a valid, binding contract. Vickers testified, however, that neither agreement ever took effect, since the parties agreed orally that the agreements were to

take effect only upon the acquisition of Duravision by Montello Resources, and that takeover never happened.  The magistrate judge thereafter excluded Exhibits 51 and 51-A from evidence.  In light of the magistrate judge's comments and Vickers' testimony, we believe that the magistrate judge excluded Exhibits 51 and 51-A because he found that they did not represent binding agreements, and thus were not relevant.  *See* Fed.R.Evid. 401 (defining relevant evidence);  402 (providing that evidence which is not relevant is inadmissible).

Federal argues that the magistrate judge abused his discretion by sustaining Duravision and MPR's objection to Exhibits 51 and 51-A on relevance grounds.  Federal contends that the exhibits are relevant because Vickers' testimony that the agreements never took effect "went at most to the weight of the agreement, not to its admissibility."  We agree.

As Vickers conceded at trial, nothing on the face of the agreements suggests that they were not to take effect until the completion of the Montello takeover.  Therefore, by ruling that the agreements were not effective, the magistrate judge improperly added to the terms of the agreement, based on parol evidence. Texas' parol evidence rule provides:  "When parties have concluded a valid integrated agreement with respect to a particular subject matter, [that] rule precludes the enforcement of inconsistent prior or contemporaneous agreements."  *Hubacek v. Ennis State Bank,* 159 Tex. 166, 317 S.W.2d 30, 31 (1958);  *see also Tripp Village Joint Venture v. MBank Lincoln Centre, N.A.,* 774 S.W.2d 746, 749

58

(Tex.App.—Dallas 1989, writ denied) (stating that extrinsic evidence is inadmissible to "supplement" the terms of a written instrument that on its face is complete and unambiguous); 14 Tex.Jur.3d *Contracts* § 224 (1981) ("A contract takes effect from the time the parties agree on its terms."). The magistrate judge's conclusion that Exhibits 51 and 51A were ineffective, and thus irrelevant, was therefore premised on a misapplication of Texas law, and the magistrate judge abused his discretion by excluding those exhibits from evidence.

Duravision and MPR argue that even if the exclusion of Exhibits 51 and 51A was error, it was harmless error, *see* Fed.R.Evid. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected...."), because Plaintiff's Exhibit 55, which was admitted into evidence, referred to an agreement providing Duravision a four percent royalty on MPR's profits. That argument is unpersuasive. Exhibit 55 does not mention the agreement found in Plaintiff's Exhibit 51A, which entitled Marc Johnson to half of MPR's profits after Duravision's four percent royalty. That agreement allocated forty-eight percent of all profits earned on Duravision displays outside the U.S.A. and Canada to Johnson, who was not awarded damages by the jury, and who is not a party to this appeal. Had the jury seen that agreement and regarded it as a binding contract, it should have awarded substantially less damages for lost profits to MPR and Duravision. Therefore, the admission of Plaintiff's Exhibit 55 does not render the exclusion of

59

Plaintiff's Exhibit 51A harmless.[48]   Federal is entitled to reversal, and to a new trial on the issue of lost profits which would have been affected by the agreement in Exhibit 51A, i.e. lost profits on Duravision machines which would have been distributed outside the United States and Canada.   On remand, if it is determined that Exhibits 51 and 51A represent a binding agreement, the lost profits awarded to Duravision and MPR should be reduced as demonstrated by the distribution specified in that agreement.

C

Federal next argues that the award of $9,000,000 in punitive damages to Duravision and MPR must be reversed because punitive damages may only be awarded where the claimant has suffered a distinct injury in tort, whereas in this case Duravision's and MPR's damages flow solely from Federal's breach of the Display Sales Agreement.   "Punitive damages are not recoverable for breach of contract.   The party seeking punitive damages must obtain at least one finding of an independent tort with accompanying actual damages."   *Texas Nat'l Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex.1986); *see also Bellfonte Underwriters Ins. Co. v. Brown,* 704 S.W.2d 742, 745 (Tex.1986) (referring to "the basic principles" that "punitive damages are not awarded for breach of contract," and "the award of damages in tort is a prerequisite to recovery of punitive damages").   "If th[e] issue sounds in contract, no

---

[48]Because we hold that Federal is entitled to reversal based on the exclusion of Exhibit 51A, we do not reach the question whether the admission of Plaintiff's Exhibit 55 renders the exclusion of Exhibit 51 harmless.

punitive damages should [be] awarded." *Karnes*, 717 S.W.2d at 903. Because we have already concluded that Duravision's and MPR's claims sound in tort, rather than contract, *see supra* part II.A.3, we reject Federal's attack on the jury's award of punitive damages.[49] Because we remand for retrial of the actual damages awarded, however, we also remand for retrial of the extent to which Duravision and MPR are entitled to punitive damages.[50]

## III

For the foregoing reasons, I would VACATE the judgment of the district court and REMAND only in part. However, because Judges Garwood and Head would remand for a new trial as to *all* damages, actual and exemplary, *see* Garwood, J., concurring in part and dissenting in part, *infra*,[51] we VACATE the judgment of the district court and REMAND for a new trial consistent with the opinion of the Court.[52]

GARWOOD, Circuit Judge, in which HEAD, District Judge, joins, concurring in part and dissenting in part:

---

[49]Federal also contends that the magistrate judge erred in awarding prejudgment interest. Because we vacate the judgment and remand for a new trial on the issue of damages, we do not review the award of prejudgment interest.

[50]*Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981) (requiring a reasonable ratio between actual and punitive damages); *Southwestern Investment Co. v. Neeley*, 452 S.W.2d 705, 707 (Tex.1970) ("[T]he amount of exemplary damage should be reasonably proportioned to the actual damages found.").

[51]Although I am sympathetic with Judges Garwood and Head's position on retrial, I believe that Part II.A.2 is consistent with Texas law and does not require a new trial on *all* damages issues.

[52]See *supra* note 1 for a delineation of those parts constituting the opinion of the Court.

I concur in parts I, II.A.1, II.A.3., II.B. and II.C. of Judge Garza's thorough opinion. I also join in those portions of part II.A.2. holding that, for the reasons there stated, various specific categories of claimed lost future revenues may not be recovered because the evidence does not establish them with reasonable certainty. Although I agree with the ultimate determination that the evidence suffices to adequately establish that DURAVISION and MPR suffered *some* recoverable lost profits, in my view the only practical and just course is to order a new trial as to all damages, actual and exemplary. The jury's actual damage findings were not divided by category but rather consisted only of one lump sum figure for each plaintiff, $3,995,000 for DURAVISION and $4,750,000 for MPR, in response to a single special interrogatory.[53] Nothing else in the verdict provides any basis on which to divide or allocate the damage award. Judge Garza's opinion demonstrates that less than a third of each plaintiff's lump sum actual damage award is sustainable, and that the entirety of each punitive damage award must be retried.[54] All significant

_____

[53]The punitive damages were similarly awarded each plaintiff in a single lump sum ($4.5 million each) in response to a single interrogatory.

[54]I do not necessarily agree with all those portions of part II.A.2. as find various categories of claimed lost future revenues adequately established. In determining whether the evidence suffices to allow a finding that these items were established with reasonable certainty, I would give more weight to the newness and lack of profit experience of the businesses involved, both that of the plaintiffs themselves and STOC, the inexperience of their executives and owners in both this type of business and in the foreign markets concerned, the lack of a track record for this or similar products in those foreign markets, the paucity of evidence as to the financial

categories of claimed lost profits were hotly disputed and none is established as a matter of law.  In these circumstances, a full retrial on damages is plainly called for.

---

responsibility of STOC and Guerra, the substantial differences between the markets (and business practices) in the foreign nations concerned and those in the United States, and the more uncertain and changing nature of the former.  I do not ultimately resolve these concerns as I believe a full new trial—at which the evidence may be different—on damages is required.  I do agree with Judge Garza that "the absence of evidence that Federal was contractually bound to produce the hundreds of machines which formed the basis of the jury's verdict [or that such machines were available at the requisite price elsewhere] calls into question the certainty of the lost profits which the jury found." *See supra* note 22.